# SAXLEHNER *v.* EISNER & MENDELSON COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 29. Argued March 22, 23, 1900.—Decided October 15, 1900.

In 1862, plaintiff's husband discovered a spring of bitter water in Hungary, and was granted by the Municipal Council of Buda permission to sell such water, and to give the spring the name of "Hunyadi Spring." He put up these waters in bottles of a certain shape and with a peculiar label, and opened a large trade in the same under the name of "Hunyadi Janos." In 1872, one Markus discovered a spring of similar water and petitioned the Council of Buda for permission to sell the water under the name of "Hunyadi Matyas." This was denied upon the protest of Saxlehner; but in 1873 the action of the Council was reversed by the Minister of Agriculture, and permission given Markus to sell water under the name of "Hunyadi Matyas." Other proprietors seized upon the word "Hunyadi" which became generic as applied to bitter waters. This continued for over twenty years when, in 1895, a new law was adopted, and Saxlehner succeeded in the Hungarian courts in vindicating his exclusive right to the use of the word "Hunyadi." In 1897 he began this suit.

*Held:* That the name "Hunyadi" having become public property in Hungary, it also became, under our treaty with the Austro-Hungarian Empire in 1872, public property here; that the court could not take notice of the

law of Hungary of 1895 reinstating the exclusive right of Saxlehner, and that the name having also become public property here, his right to an exclusive appropriation was lost.

*Held also:* That even if this were not so, he, knowing the name "Hunyadi" had become of common use in Hungary, was also chargeable with knowledge that it had become common property here, and that he was guilty of laches in not instituting suits, and vindicating his exclusive right to the word, if any such he had.

*Held also:* That acts tending to show an abandonment of a trade-mark being insufficient, unless they also show an actual intent to abandon, there was but slight evidence of any personal intent on the part of Saxlehner to abandon his exclusive right to the name "Hunyadi," and that a company, to whom he had given the exclusive right to sell his waters in America, was not thereby made his agent and could not bind him by its admissions.

*Held also:* That the fact that he registered the trade-mark "Hunyadi Janos" did not estop him from subsequently registering the word "Hunyadi" alone.

*Held also:* That the appropriation by other parties of his bottle and label, being without justification or excuse, was an active and continuing fraud upon his rights, and that the defence of laches was not maintained.

*Held also:* That the adoption by the defendant of a small additional label, distinguishing its importation from others did not relieve it from the charge of infringement, inasmuch as the peculiar bottles and labels of the plaintiff were retained.

THIS was a bill in equity filed in the Circuit Court for the Southern District of New York by the widow of Andreas Saxlehner, deceased, a resident of Buda-Pesth and a subject of the King of Hungary, against the Eisner and Mendelson Company, importers and wholesale dealers, to enjoin the defendant from selling any water under a name in which the word "Hunyadi" occurs, or making use in the sale of bitter waters of labels, in form, color, design and general appearance, imitating the labels used by plaintiff in the sale of Hunyadi Janos water.

The bill averred in substance that plaintiff's husband, Andreas Saxlehner, was, until May 24, 1889, the proprietor of a certain well within the city limits of Buda-Pesth, and that in 1863 he began to sell the waters of the same in the market under the name or trade-mark of "Hunyadi Janos;" that as his business increased he acquired additional territory, opened new wells, adopted a novel style of bottles and a peculiar label, and that the waters soon became known in all the markets of the world

under the name of "Hunyadi Janos," or in England and the United States under the name of "Hunyadi" alone; that in March, 1876, Saxlehner entered into a contract with the Apollinaris Company of London, under which such company was given the exclusive right to sell this water in Great Britain and the United States, and that such contract was not terminated until March, 1896; that this company used a label of similar design but of different color, and that large quantities of this water were exported by Saxlehner through such company and sold in the United States under the name of "Hunyadi" water; that Saxlehner died May 24, 1889, and plaintiff succeeded him in the business; that prior to his death Saxlehner obtained the registration in the Patent Office of the name "Hunyadi" as his trade-mark; that the defendant, knowing of these facts, had unlawfully imported and sold bitter water, not coming from plaintiff's wells, in bottles of identical shape and size as those used by plaintiff, and with labels in "close and fraudulent simulation of your orator's trade-mark," but under the name of "Hunyadi Laszlo" or "Hunyadi Matyas"—all in defiance of plaintiff's right, and with the design of imposing the waters upon the public as those of the plaintiff.

The answer denied the material allegations of the bill, and averred that in the year 1873, one Ignatius Markus, being the proprietor of a certain well within the limits of Buda-Pesth, applied to the proper authorities and was granted the registration of the name "Hunyadi Matyas" as a denomination of the waters of his spring, such authorities holding that the name was distinguished from that of the "Hunyadi Janos;" that "Hunyadi Janos," when anglicised, is John Hunyadi, the name of a celebrated Hungarian hero, and that the name "Hunyadi" is a common one in Hungary, and means of or from Hunyad, and that for this reason it is of itself incapable of exclusive appropriation by any one, being a common descriptive personal name, and also used to designate certain districts and towns in Hungary; that in the year 1889 the word had become a generic term, describing a kind of bitter aperient water, the peculiar product of a large number of wells in Hungary; that the shape of the bottle and the peculiarities of the label have be-

come common property, and were adopted by every one who sold the Hunyadi water, whether under the name of "Hunyadi Janos," "Laszlo," "Matyas," "Arpad," etc., and that to the time of his death Saxlehner had never asserted or made any claim to the exclusive use of his style of bottle, or capsules, or labels; that in 1886 or 1887 the Apollinaris Company brought suit against the American agents of several of these waters and obtained temporary injunctions, which were subsequently dissolved upon evidence that the word "Hunyadi" was used in Hungary as part of the name of a number of different mineral waters, that Saxlehner refused to join with or aid the Apollinaris Company in opposing a dissolution of such injunctions, and that thereafter these waters were sold freely, openly and continuously in competition with the "Hunyadi Janos" in the bottles and with the labels and capsules affixed thereto as before stated, with the knowledge, consent and acquiescence of Saxlehner and his agents; that defendant, a Pennsylvania corporation, entered into a contract with the owners of the "Hunyadi Matyas" spring, and obtained the exclusive right to import their waters into the United States for the term of twenty-five years; that in 1890 it began to sell this water in like bottles and with like capsules and labels affixed thereto as now claimed by the plaintiff herein to be in violation of her claimed rights, which bottles, capsules and labels were similar to those in which the said "Hunyadi Matyas" water had been first imported, and that this was done with the consent of the American agent of the Apollinaris Company, who expressly stated that he had no objection to the label used by the defendant, nor to the way in which it was advertising the "Hunyadi Matyas" water; that in 1889 it also became the agent for sale in the United States of the "Hunyadi Arpad," "Hunyadi Laszlo" and "Hunyadi Bela" waters, and began to sell the same in large quantities; that these waters were put up for sale and sold in bottles similar to those of the "Hunyadi Janos," with like capsules and labels; that these waters were sold in open competition with the "Hunyadi Janos" until some time in 1893, when plaintiff stopped said competition in part by purchasing the Arpad and Bela springs, and thereupon revoked the agency of the defend-

ant to sell such waters; that in 1877 Saxlehner applied to the Commissioner of Patents for the registration of the words " Hunyadi Janos " as a trade-mark; that such trade-mark was registered September 11, 1877, by which proceeding he abandoned all claim and assertion of right to the word " Hunyadi " in and of itself, and that it had for many years previously been a generic term to designate this class of waters. The answer further alleged that the defendant, in order to designate the waters sold by it and to secure additional protection to the label used by it, registered the trade-mark " Hunyadi Matyas," since which time the defendant has used such trade-mark as stated therein, and in accordance therewith.

As the case depended almost wholly upon questions of fact, a somewhat elaborate statement of the evidence becomes necessary.

In 1862, Andreas Saxlehner discovered within the city limits of Buda-Pesth, Hungary, in a valley surrounded on all sides by hills acting as a natural barrier, secluding it from the outer world, a spring, which was named by him the " Hunyadi " spring, and on January 19, 1863, the Municipal Council of Buda-Pesth granted him permission to sell water taken from such spring and to give the spring the name of " Hunyadi," upon the payment of a small sum of money for hospital purposes. Soon after this he began to bottle the water of his spring and to sell it under the arbitrary name or trade-mark of " Hunyadi Janos;" in other words, John Hunyadi, a Hungarian hero of the fifteenth century. Several wells were subsequently sunk by him in the same valley to the number of about one hundred and twelve, all of which produced water, substantially of the same chemical combination, which is led through a system of pipes to large subterranean cisterns, from which it is taken and bottled. It soon began to be exported beyond the limits of Hungary to other European countries, and also to the United States.

Saxlehner was not, however, the first one in Hungary to put up the bitter waters with which that kingdom abounds, but others were already sold in the market, one of them being called " Hildegarde," and another " Franz Deak." Different

bottles and labels were used for these waters, when Saxlehner adopted, in conjunction with the distinctive name of "Hunyadi Janos," a novel style of bottle of straight shape with a short neck, to the top of which was attached a metal capsule bearing the inscription "Hunyadi Janos, Budai Keserüviz Forrás," meaning "Hunyadi Janos, bitter water of Buda," together with a supposed portrait of the hero stamped thereon. He also adopted a peculiar label covering almost the whole body of the bottle, divided into three longitudinal panels, the middle one of which bore the same portrait in a medallion, with the name of "Hunyadi Janos" written in large letters on the top of the label, the color of the middle panel being a reddish brown and the outer panels white. As this water was exported to and sold in the various countries of the world, a different custom concerning its appellation sprung up in different countries, the Latin races using the word "Janos" as the common appellation of the water, it being known as "Eau de Janos" or "Aqua di Janos," while in England and the United States of America the name of "Hunyadi" became its common appellation, it being known as Hunyadi water.

In 1872, it seems that one Ignatius Markus discovered a spring upon a plot of ground leased by him, which also produced bitter water of similar quality, and shortly thereafter petitioned the Municipal Council of Buda-Pesth not only for permission to sell the water, which was unconditionally granted upon the report of the town physician concerning the quality of the water found, but also to be allowed to name this spring "Hunyadi Matyas," and to bring the water into commerce under that name. This was denied, upon the petition and protest of Saxlehner, who claimed the exclusive right to the use of the name "Hunyadi." It was said that the granting of the denomination "Hunyadi Matyas" to another spring "would very likely, nay certainly, lead both between the owners of the two springs and among the consuming public, to unpleasant misunderstandings, which it is the duty of the authorities to avoid and even to prevent. And further, the fact that petitioner, notwithstanding the many designations at his disposal, seeks to apply the name 'Hunyadi' to his spring, undoubtedly shows the not very noble intention

on his part to avail himself of the great diffusion and good renown enjoyed by the Saxlehner Hunyadi Bitter Spring, both at home and abroad, which, however, cannot be tolerated by the authorities, and in the present case all the less, as it is a well-known fact that Mr. Saxlehner was able to secure this good renown to his spring only through many years' labor and at considerable expense."

On a petition in appeal, however, to the Minister of Agriculture, in 1873, the decision of the Council, which denied to Markus the permission to use the name "Hunyadi Matyas," was reversed, because of certain omissions by Saxlehner to conform to the local laws, and also because "Hunyadi Janos" and "Hunyadi Matyas" "represent two quite clearly different names, which may stand without any infringement to each other." This spring was afterwards registered in Buda-Pesth by the name of "Hunyadi Matyas," and thereupon the proprietors of other wells began to sell their waters in Europe under the name of Hunyadi with an added name, and also with the use of a close imitation of the red and white labels. It did not appear, however, that Markus sold any water or made use of the permission granted to him by the Minister, or obtained a license from the local authorities; but, in 1876, the firm of Mattoni & Wille became the purchasers of the plot of ground leased by Markus and several other adjoining plots containing springs, and in that year registered a separate trade-mark and name for each of the six springs which they then acquired, among which was a trade-mark bearing the name "Hunyadi Matyas." In 1877 they began selling these waters in Hungary, claiming certain specific differences of composition of the various waters which recommended them for different purposes.

In February, 1876, Saxlehner made a contract with the Apollinaris Company, Limited, of London, by which that company agreed to purchase a certain quantity yearly, and Saxlehner bound himself for a term, which finally expired in 1896, to give the company the exclusive right to sell his "Hunyadi Janos" water in Great Britain, United States and other transmarine countries. The company agreed to purchase at least 100,000 bottles yearly until 1878, and at least 150,000 bottles

thereafter at a stated price. In addition to this Saxlehner agreed not to fill any orders coming from the territory granted to the company, but to make them over to the company. A special label was designed to be used on the bottles sold by the company of substantially the same contents and characteristics, but of a different color, the body of the label being a dark blue, with a red or reddish brown central field. A narrow strip on the top of the label contained the name of the Apollinaris Company as the importer, and from the making of this contract large quantities of water bearing this label were exported and sold in the United States under the name of "Hunyadi Janos," or the shorter name "Hunyadi."

After April, 1889, and until the cancellation of the contract in 1896, this company placed upon each bottle of Janos water which it sold in this country a red diamond containing these words: "The red diamond is the trade-mark of the Apollinaris Company, Limited, and is meant only to indicate that the mineral waters so marked are sold by the Apollinaris Company, Limited."

In 1887, Saxlehner caused the name "Hunyadi" to be registered separately from "Janos" as a trade-mark in the United States Patent Office. In the statement accompanying this registration he was again careful to refer to the red and white or red and blue label upon which said trade-mark was used by him, and to repeat the caution that he did not in anywise intend by said registration to abridge his right to the exclusive use of said label as a whole, or to any of its features.

The Apollinaris Company embarked in the business of selling Hunyadi Janos water in the United States, but met with competition from one Scherer, who imported the water under the red and white label from Europe, buying it from parties who had purchased it from Saxlehner. The company sought to enjoin Scherer from so selling upon the ground of its exclusive right within the United States, but failed in the suit. The case was decided in 1886, and reported in 27 Fed. Rep. 18.

In the same year Mattoni & Wille of Buda-Pesth consigned to one Andres in New York one hundred and twenty-one cases of Hunyadi Matyas water taken from one of four springs pur-

chased by them, one of which was the original Markus spring above mentioned.

About the same time the firm of Ignatz Ungar & Son began to sell waters from a spring owned by them, which was designated " Hunyadi Arpad," through one Joseph Ungar as their agent. This water was put up in an imitation of Saxlehner's red and blue labels. The Matyas water was also put up in red and white labels of similar design. Suits were brought against them in 1886, in the Circuit Court of the United States, by the Apollinaris Company to enjoin the use of the name " Hunyadi" and of the labels. These suits were, however, withdrawn for want of jurisdiction, and two other cases, one against Andres and the other against Ungar, were brought by the Apollinaris Company in the Supreme Court of the State. *Ex parte* injunctions were issued in each case in February, 1887, and remained in force until July, 1888, when the injunction in the Ungar suit was dissolved upon application of the defendant, and soon thereafter the Andres suit was voluntarily discontinued. Saxlehner appeared to have had no knowledge of these suits, although an effort was made, which the court below found to have been unsuccessful, to show that he was notified of the motion to dissolve the injunction, and refused to assist in opposing it. The defendants in these suits seem to have relied largely upon the fact that, under the laws of Hungary, as they then were, they had a right to make use of the word " Hunyadi," provided they annexed thereto as a suffix a word different from " Janos," as for instance, " Matyas " or " Arpad," and that, having obtained permission by royal grant to make use of these names in Hungary, they were entitled to make use of the same names in other countries.

In the mean time, however, and in 1887, Saxlehner instituted another suit in Hungary to enjoin the use of the name " Hunyadi" as applied to a water sold there called the " Hunyadi Josef." He was again unsuccessful, not only in preventing the use of the word " Hunyadi," but even in preventing the use of colorable imitations of his red and white label, apparently on account of the lack of efficient statutes upon the subject of trademarks. As one of the witnesses, Saxlehner's son, states, he was

advised by his lawyer that before 1890 there was a statute which gave protection against so-called counterfeit or imitation labels and against literal imitations, but not imitations which were similar merely.

In 1890, a statute was passed which gave a protection to pictorial trade-marks only, but not to trade-marks designated by name. Plaintiff, whose husband died in 1889, at once took advantage of this statute, and instituted suits against Mattoni & Wille, as well as a number of other infringers. In 1895, another act was passed giving protection to verbal trade-marks. The suit against Mattoni & Wille resulted in an order of the Minister of Commerce, November 26, 1894, cancelling the several trade-marks of Hunyadi Matyas water, "because, according to the opinion of three experts consulted by the chamber, such trade-marks are similar in composition, design and color, and also for general impression to the trade-marks previously registered for the firm Saxlehner, and have been found to be imitations of the same and apt to mislead the public."

A similar suit instituted by plaintiff against the "Compagnie Générale d'Eaux Universelles et de Bains de Mer" resulted in a similar decree canceling the Hunyadi Laszlo label, "because of the three experts consulted, two have pronounced same to be entirely similar to the trade-mark registered for Saxlehner, and the danger of misleading is greatly augmented by the fact that on this trade-mark the name Hunyadi is applied in a prominent place."

The sale of the Hunyadi Laszlo water seems to have been practically stopped by this decree, but notwithstanding the decree against them of November 26, 1894, Mattoni & Wille continued to use the name of Hunyadi Matyas separate from the label, and exported water as before to the defendant in this suit with red and blue labels, which were not registered in Hungary.

In 1895, however, another act was passed in Hungary for the registration of words or names as trade-marks. Plaintiff took advantage of this, registered the name "Hunyadi" as a trade-mark, and promptly instituted another suit against Mattoni & Wille, which resulted, in 1896, in another decree cancelling, not

only the illustrated trade-marks, but the verbal trade-mark Hunyadi Matyas, and awarding to the plaintiff a priority of right to the exclusive use of the words " Hunyadi Janos " and " Hunyadi " alone, both as a commercial denomination as well as a trade-mark.   In the decree of the Minister the prior decree of the Minister of Agriculture of the year 1873, legalizing the use of Hunyadi Matyas, was referred to and treated as super-seded by the laws of 1890 and 1895.   " There is," says he, " therefore absolutely no connection between that decision and the case now under consideration."   Similar decrees were ren-dered the same year against other defendants who sought to appropriate the name Hunyadi, including " Hunyadi Josef," against which Saxlehner had been unsuccessful in 1887 ; " Hun-yadi Lajos," and also " Uj Hunyadi," or new Hunyadi, whose litigation against Saxlehner seems to have been carried on in the interest of the Apollinaris Company.

In fact, this litigation seems to have resulted in a complete vindication of the right of Saxlehner to the use of the word " Hunyadi."

Promptly upon the rendition of these decrees, and early in 1897, this suit, as well as the others hereinafter mentioned, was instituted.

The case came on for hearing before the Circuit Court upon pleadings and proofs, and resulted in a decree enjoining the defendant from selling, or offering for sale, any bitter water not coming from the " Hunyadi Janos " wells of the plaintiff in bottles of a straight shape, with a short neck, and bearing labels in color, size, shape and general design so closely similar to plaintiff's said label as to be calculated to deceive, but per-mitting the defendant to make use of the name " Hunyadi " as a prefix to some other name than " Janos," and denying the injunction demanded by the plaintiff against the use of the name " Hunyadi."   88 Fed. Rep. 61.

On appeal to the Circuit Court of Appeals, the decree of the Circuit Court was affirmed as to the name " Hunyadi," but re-versed as to the label, and the bill dismissed.   63 U. S. App. 139, 145.

*Mr. Antonio Knauth* and *Mr. John G. Johnson,* for Saxlehner. *Mr. Arthur von Briesen* was on their brief.

*Mr. Charles G. Coe* and *Mr. Edmund Wetmore* for respondents.

MR. JUSTICE BROWN, after stating the case as above, delivered the opinion of the court.

This case involves the question of plaintiff's exclusive right to the use of the name "Hunyadi" as a trade-mark for Hungarian bitter waters, as well as her right to the red and blue label and its characteristic features used by her upon the bottles in which she has been accustomed to sell "Hunyadi Janos" water.

From the foregoing summary of the facts it appears:

1. That Saxlehner was the first to appropriate and use the name "Hunyadi" as a trade-mark for bitter waters, and that such name being neither descriptive nor geographical, but purely arbitrary and fanciful as applied to medicinal waters, was the proper subject of a trade-mark;

2. That in the shape of his bottles, the design of his capsules and his labels, he was originally entitled to be protected against a fraudulent imitation;

3. That the defendant is selling a water under the name of "Hunyadi Matyas" in bottles of the same size and shape as the plaintiff's, containing a label in three parallel panels of the same colors, size and general design as those of the plaintiff, that their general appearance is such as to deceive the casual purchaser, and that such bottles and labels were evidently designed for the purpose of imposing the defendant's waters upon the public as those of the plaintiff. A moment's comparison of the two labels will show that, while the printed matter upon each is different from that upon the other, their general resemblance is such as would be likely to mislead the public into the purchasing of one for the other. While the proprietors of the "Hunyadi Matyas" water undoubtedly found a justification for their use of the word "Hunyadi" in the decision of the Min-

ister of Agriculture of 1873, that decision did not cover the use of the simulated label, the adoption of which seems to have been an act of undisguised piracy.

Practically, the only defences pressed upon our attention are those of abandonment and laches.

1. To establish the defence of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed. *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, 186; *Moore* v. *Stevenson*, 27 Conn. 13; *Livermore* v. *White*, 74 Maine, 452; *Judson* v. *Malloy*, 40 California, 299; *Hickman* v. *Link*, 116 Missouri, 123. And in a recent English case this doctrine has been applied to a case of trade-marks. *Mouson* v. *Boehm*, 26 Ch. Div. 398. With regard to the defence of abandonment, it may with confidence be said that there is but very slight evidence of any personal intention on the part of Andreas Saxlehner or his wife to abandon the use of the word " Hunyadi " or dedicate the same to the public, and none at all of an intent to abandon the peculiar bottles and labels in connection with which he sold his waters. In fact, Saxlehner's whole life was a constant protest against the use by others of the name " Hunyadi." He discovered his spring in 1862, and in 1863 obtained permission to give it the name of Hunyadi Spring. He carried on an uninterrupted trade under that name until 1872. It also appears from the certificate of the Chamber of Commerce and Industry that the trade-mark " Hunyadi Janos " was, on December 12, 1872, registered, and that previously to such registration no trade-mark was entered in which the name " Hunyadi " or " Janos " was contained. It further appears that Ignatius Markus had no sooner petitioned the town council for a license to apply to his spring the name of " Hunyadi Matyas " than Saxlehner entered his protest, and was at first successful, but was finally defeated, and that upon the strength of this decision other springs were opened by various parties under trademarks, of which the word " Hunyadi " was the principal component. At that time, owing to the inefficacy of the Hungarian

laws upon the subject of trade-marks, he could do no more. In 1877 he registered the trade-mark "Hunyadi Janos" in the Patent Office of the United States. In 1884 he registered both his red and white and red and blue labels in the Buda-Pesth Chamber of Commerce, the latter being intended for use by the Apollinaris Company. In 1887 he instituted an unsuccessful suit in Hungary against the use of the words "Hunyadi Josef." Upon the passage of the Hungarian law of 1890, legalizing the use of pictorial trade-marks, the plaintiff again registered the three labels, and in the following year instituted suits against all infringers in Hungary, which finally resulted in a complete establishment of her rights to the name Hunyadi. In 1887 Saxlehner registered the word "Hunyadi" as his trade-mark in the Patent Office of the United States, and in 1895, when the act for the protection of verbal trade-marks was enacted, plaintiff registered the same word in Hungary. Saxlehner appears, however, to have successfully protested against Mattoni & Wille's registration of "Hunyadi Matyas" in Germany. In June, 1896, plaintiff also instituted a suit against the Apollinaris Company in England, and obtained a final injunction against the illegal use of the name "Hunyadi." In the decree of the Court of Chancery, which is reproduced, it was ordered that the Apollinaris Company deliver up to the plaintiff for destruction all labels, trade documents and capsules in their possession which, by reason of their exhibiting the name "Hunyadi," are capable of being used for business in the United Kingdom for any Hungarian Bitter Water not being Hunyadi Janos water. Immediately upon the determination of the Hungarian litigation, and in the spring of 1897, plaintiff began these suits.

There is nothing in these facts tending to show an abandonment by Saxlehner or the plaintiff of their rights either in the name of Hunyadi or in the labels, unless it be the fact that the trade-mark registered in the United States in 1887 contained the words "Hunyadi Janos," which, it is insisted, was a waiver of a right thereafter to register the name "Hunyadi" alone. That position, however, assumes that, in the absence of such re-registration, other dealers would have the right to seize upon and appropriate the principal word "Hunyadi" of the prior

trade-mark, provided they changed the final word and substituted another. We are not prepared to indorse this contention. It is not necessary to constitute an infringement that every word of a trade-mark should be appropriated. It is sufficient that enough be taken to deceive the public in the purchase of a protected article. It was said by Vice Chancellor Shadwell, in 1857, that if a thing contained twenty-five parts, and one only was taken, such imitation would be sufficient to contribute to a deception, and the law would hold those responsible who had contributed to the fraud. *Guinness* v. *Ullmer*, 10 Law Times, 127. While this may be a somewhat exaggerated statement, the reports are full of cases where bills have been sustained for the infringement of one of several words of a trade-mark. *Shrimpton* v. *Laight*, 18 Beav. 164; *Clement* v. *Maddick*, 1 Giff. 98; *Hostetter* v. *Vonwinkle*, 1 Dill. 329; *Morse* v. *Worrell*, 9 Am. Law Review, 368; *Grillon* v. *Guenin*, Weekly Notes (1877), 14; *American Grocer Pub. Association* v. *Grocer Pub. Co.*, 25 Hun, 398. It would seem that the registration in 1887 of the single word "Hunyadi" was really unnecessary for the protection of Saxlehner's rights, though we see no reason for holding the former registration an estoppel. The evidence shows that these Hungarian bitter waters were largely known in this country as Hunyadi waters, and that in a certain sense Hunyadi had become a generic word for them. Of course, if it became such with the assent and acquiescence of Saxlehner, he could not thereafter assert his right to its exclusive use. But as this appropriation was made against his constant protest, and as he apparently made every effort in his power to put a stop to the use of it, it ought not to be charged up against his claim that the word had become generic.

It is contended, however, that the conduct of the Apollinaris Company was such as to show an abandonment both of the name and label, and that plaintiff is estopped by their act in further asserting title to them. This defence presupposes that the Apollinaris Company had power to bind Saxlehner by its admission and contract. Certainly the contract gave it no such power in express terms. Saxlehner did not purport to make

the company his agent. He agreed to sell the company a certain number of cases of his water at a certain price, and also agreed to sell to no one else during the pendency of the contract. It was agreed that their consignments should carry the label " Sole importers, Apollinaris Company, Limited, 19 Regent street, London, S. W." The company agreed not to compete with Saxlehner upon the continent, and upon his part he agreed to make over to the company all orders arising from countries reserved to it, as well as to refuse such orders where he had good reason to suppose they were intended for such countries. This is practically all there is of the contract. No agreement was made with respect to the trade-mark or the good will of the business, and the company reserved the right, which it subsequently exercised, of cancelling the contract upon notice. While such contract may have authorized the company to prosecute infringers here, and in the conduct of those particular suits Saxlehner may have been bound, it did not agree to do so or preclude the institution of other suits by him, nor was there any authority on the part of the company to bind him by its admissions.

The conduct of the Apollinaris Company, relied upon as evidence of abandonment, consists principally in the discontinuance of the two suits against Ungar and Andres after preliminary injunctions had been obtained (Saxlehner was not shown to have had knowledge of these suits); of a conversation between Mendelson, treasurer of the defendant company, and Steinkopf, a director of the Apollinaris Company in London, in which Mendelson spoke of his intention to sell the Hunyadi Matyas water, of which he had obtained control, and Steinkopf stated " that he could have no objection to that; that there were other Hunyadi waters," and of some other statements equally unimportant. There is little in any of these indicative of an intent on the part of the Apollinaris Company to abandon its exclusive right to the use of the word " Hunyadi " in America. Certainly, nothing indicative of such an intent on the part of Saxlehner, whose conduct in Hungary was wholly inconsistent with that theory. Evidence that the Apollinaris Company intended to abandon an exclusive right to the name " Hunyadi " might be

sufficient as against them to defeat a suit for an injunction, but would not be binding upon the plaintiff unless done with her knowledge and acquiescence.

2. The defence of laches depends upon somewhat different considerations, and, so far as it applies to the use of the word "Hunyadi," we think it is established. It appears that after the decision of the Minister of Agriculture in 1873 sustaining the claim of Markus to the trade-mark "Hunyadi Matyas," other springs were opened whose waters were bottled under different trade-marks, in all of which the word "Hunyadi" was a component, and as early as 1886 these waters found their way to the United States, and were put on sale here with the knowledge of the Apollinaris Company. There is no evidence that Saxlehner had personal knowledge of these infringements, and while something may be said in his favor in view of his persistent efforts to establish his rights in Hungary, he was bound to know the law in this country, and to take steps within a reasonable time to vindicate his rights. The infringers were making use of their trade-marks under licenses from the Hungarian Government, and we see no reason to doubt that they were proceeding in good faith to dispose of their waters under the trade-marks registered in Hungary. Under these circumstances, if Saxlehner had intended to assert his rights under the laws of this country, to the exclusive use of the word "Hunyadi," he was bound to act with reasonable promptness. It is true that he may have supposed the Apollinaris Company would assert his rights in that particular for their own benefit; but if, as we have already held, he was not bound by their admissions, he is in no position to take advantage of their inaction, and, as against traders who were selling bitter waters under trademarks legalized by the Hungarian Government, he should not have waited until the name "Hunyadi" had become generic in this country, and indicative of this whole class of medicinal waters.

We do not find it necessary to decide exactly what effect shall be given to the various decrees of the Hungarian ministers and courts. It is quite sufficient to observe that the use of the words "Hunyadi Matyas" was expressly sanctioned

within the Kingdom of Hungary by the Minister of Agriculture in 1873, and it would seem that under our treaty with the Austro-Hungarian Empire of June 1, 1872, 17 Stat. 917, the right to use the word became available in the United States. By the first article of this treaty " every reproduction of trademarks which, in the countries or territories of the one of the contracting parties, are affixed to certain merchandise . . . is forbidden in the countries or territories of the other of the contracting parties;" and by the same article, "If the trademark has become public property in the country of its origin, it shall be equally free to all in the countries or territories of the other of the two contracting parties." In view of the decision of the Minister of Agriculture of 1873, sustaining the trade-mark "Hunyadi Matyas," and the subsequent adoption of the word "Hunyadi" in connection with some other word by numerous proprietors of similar waters, it seems to be clear that the word became and continued to be for twenty years public property in the Kingdom of Hungary, and it is difficult to escape the conclusion that it also became so here. It is true the law of Hungary was subsequently changed in this particular, and that the courts of that country held the plaintiff entitled to the benefit of that change; but it needs no argument to show that, if the word once became public property here, a subsequent change in the law in her own country would not enure to the advantage of the plaintiff here. The right to individual appropriation once lost is gone forever.

If, upon the other hand, we assume that the case can be decided without reference to the law of Hungary or the decisions of its officers and courts, the plaintiff is still at a disadvantage by reason of not instituting her suits more promptly. Saxlehner knew as a matter of fact that the Minister of Agriculture had overruled his protest, and that the word "Hunyadi" had become public property in the Kingdom of Hungary. He knew that a large number of dealers would appropriate the word, and that he was himself selling a large quantity of bitter water in the United States. He must also have known, or at least had good reason to know, that his competitors were doing the same thing. Under such circumstances he should have instituted

inquiries upon his own account, and, regardless of his contract
with the Apollinaris Company, have seen to it that his own in-
terests were protected.  If the Apollinaris Company were not
his agent for the protection of his rights in the United States,
then it was incumbent upon him to assert such rights person-
ally or through some other recognized medium.  In now in-
voking our laws, his successor is bound to show that she has
complied with our requirements of diligence and promptness in
instituting suit.  She has failed in this particular.  By twenty
years of inaction she has permitted the use of the word by
numerous other importers, and it is now too late to resuscitate
her original title.

3.  This argument, however, has but a limited application to
the appropriation of the bottles and red and blue labels cover-
ing them, which appear to have been seized upon by the pro-
prietors of the Matyas spring as well as by others, without a
shadow of justification and in fraud of plaintiff's rights.  As
already stated, Saxlehner, when he began selling his water,
adopted not only the name "Hunyadi Janos," but a straight
bottle with a short neck, to the top of which was attached a
metal capsule with an inscription, as well as a peculiar label,
covering almost the whole body of the bottle, divided into three
rectangular panels of red and white, which at the time of his
contract with the Apollinaris Company was changed to red
and blue, so far as it applied to waters sold to that company
for the American market.  A narrow strip on the top of the
label was added, containing the imprint of the Apollinaris Com-
pany as importers, and from 1876, the date of the contract, un-
til 1886, the business was carried on by the Apollinaris Com-
pany in this country without any important competitors.  In
1886, however, Mattoni & Wille began to consign "Hunyadi
Matyas" bitter water to New York, put up in bottles bear-
ing a red and white label.  In 1889 the Eisner & Mendelson
Company, defendant herein, made a contract with Mattoni &
Wille, by which it obtained the sole agency for the United
States and Canada for the sale of their bitter waters for the
term of twenty years.  During 1889 and 1890 defendant im-
ported some twenty thousand bottles under the name of "Royal

Hungarian Bitter Water," under a red and white label devised by themselves. In 1890 the defendant took a new lease for five years, with an option for a renewal for twenty years, from Mattoni of the Hunyadi Matyas spring. The Circuit Court found in this connection that " the reason which induced Eisner to make this lease was his desire to control the American label; so that neither Mattoni & Wille nor European producers could interfere with the American trade. A new label was therefore forthwith devised by Eisner, which was a reddish brown and blue label, and is described in the complaint containing the name ' Hunyadi Matyas,' ' Buda Keserüviz ' and a medallion portrait of King Stephen in the center of the red division. He intentionally simulated the Saxlehner United States label for the purpose of obtaining, by means of the simulation, part of the good will which the Janos water had gained."

We are pointed to no decision of the Hungarian authorities authorizing the use of Saxlehner's label by other parties.

The petition of Markus did not ask for permission to use it. The decision of 1873 did not grant it. The decree favorable to Saxlehner did not mention it, but dealt only with the name " Hunyadi." Notwithstanding repeated violations of his label, he seems to have been unable to obtain redress on account of the inefficacy of the laws until 1896, when a competitive trademark was ordered to be canceled in his favor by reason of its resemblance to Saxlehner's label, as well as by the use of the word " Hunyadi." In all his applications, both in Hungary and the United States, for the registration of his trade-mark name, there is an express reservation of his right to the medallion head of Hunyadi and to his label. Indeed, we find no authority whatever for the appropriation of this label by any of Saxlehner's competitors, and nothing to show that it was not a case of undisguised piracy. The only justification for its appropriation now insisted upon is the fact that, by general use in this country for the past ten years, it has come to be recognized as a kind of generic label applicable to all Hungarian bitter waters, and if Saxlehner had originally an exclusive right to make use of it, that right has been lost by his acquiescence and that of the Apollinaris Company in its general use by other

importers.   But in cases of actual fraud, as we have repeatedly held, notably in the recent case of *McIntyre* v. *Pryor*, 173 U. S. 38, the principle of laches has but an imperfect application, and delay even greater than that permitted by the statute of limitations is not fatal to plaintiff's claim.   We have only to refer to the cases analyzed in that opinion for this distinguishing principle that, where actual fraud is proven, the court will look with much indulgence upon the circumstances tending to excuse the plaintiff from a prompt assertion of his rights.   Indeed, in a case of an active and continuing fraud like this we should be satisfied with no evidence of laches that did not amount to proof of assent or acquiescence.

As applicable to trade-marks, two cases in this court are illustrative of this principle.   In *McLean* v. *Fleming*, 96 U. S. 245, there had been apparently a delay of about twenty years in instituting proceedings, but the court observed that " equity courts will not, in general, refuse an injunction on account of delay in seeking relief, where the proof of infringement is clear, even though the delay may be such as to preclude the party from any right to an account for past profits."   An injunction was granted in this case, but it was held that by reason of inexcusable laches, the complainant was not entitled to an account of gains or profits.   See also *Harrison* v. *Taylor*, 11 Jurist (N. S.), 408.   An effort was made in *Menendez* v. *Holt*, 128 U. S. 514, to obtain a reconsideration of the principle of *McLean* v. *Fleming*, so far as it was therein held that an injunction might be awarded, though the complainant were precluded by his delay from obtaining an account of gains and profits.   But the Chief Justice observed: " The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it.   Persistence then in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked.   Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself, . . . . nor will the issue of an injunction

against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right." *Fullwood* v. *Fullwood*, 9 Chan. Div. 176. ". . . So far as the act complained of is completed, acquiescence may defeat the remedy on the principle applicable when action is taken on the strength of encouragement to do it, but so far as the act is in progress and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise."

In the case under consideration we do not see how it is possible to wring an abandonment on the part of Saxlehner or the plaintiff from the repeated and persistent efforts made by them in Hungary to assert their rights. But it was not until the law was amended in 1895 that these efforts were successful. It can scarcely be wondered at that, in view of the disabilities under which he labored in his own country, Saxlehner should have thought it futile to undertake the prosecution of his rights in a distant land. As the defendant is unable to call to his assistance any authority from the home government for the use of these simulated labels, and as they and their vendors in Hungary seized upon these labels with knowledge of Saxlehner's rights, it is no hardship to enjoin their further use, and to hold defendant liable for such profits as it may have realized or for such damages as the plaintiff may have sustained by reason of the illegal use.

It seems, however, that in 1893 the defendant company began to affix to their bottles of Matyas water an additional label, consisting of a red seal upon a white ground, and containing the words, " Ask for the Seal brand. This label has been adopted to protect the public from imitation and as a guarantee of the genuineness of the Hunyadi Matyas Water imported solely by Eisner and Mendelson Co., New York." The attention of druggists was called to this seal brand by advertisements in the trade papers. The Circuit Court was of opinion that, as the word " Hunyadi" had become generic, and was no longer subject to individual appropriation, this label was a sufficient attempt on the part of defendant to assert that it was the seller of the

Matyas water, and that from its adoption it freed the defendant from the charge, which before that time was true, that it was cajoling or deceiving the ordinary purchaser into the belief that he was buying the Janos water; and in its decree refused to enjoin the defendant from selling such water under the red and blue label bearing the name "Hunyadi Matyas" in connection with the Seal brand label.

We are of opinion, however, that as defendant's bottle and label are a clear infringement upon those of the plaintiff, it would be destructive to her just rights to permit the use of such bottles and labels by the defendant, notwithstanding the affixing of the Seal brand, which is a mere private mark of the importer. The injury to her is in the simulation of her bottle and label, and she has the right to require that her competitors shall be forced to adopt a style of bottle which no one with the exercise of ordinary care can mistake for hers. While this label may have been adopted in good faith, we do not think its employment would prevent the casual customer from purchasing this water as that of the plaintiff, and that the injunction should also go against its use and that plaintiff should recover her damages therefor.

> *We are therefore of opinion that the decree of the Circuit Court of Appeals must be reversed, and the case remanded to the Circuit Court for the Southern District of New York, with directions to reinstate its decree of April* 29, 1898, *except so far as it denies to the plaintiff an injunction against the use of the Seal brand labels and damages sustained by such use, and for further proceedings not inconsistent with the opinion of this court.*