## DWINELL–WRIGHT CO. v. WHITE HOUSE MILK CO., Inc.

### No. 494.

District Court, W. D. New York.

Feb. 11, 1942.

Frederick R. Twelvetrees, of Buffalo, N. Y. (Mason, Fenwick & Lawrence and Edward G. Fenwick, all of Washington, D. C., of counsel), for plaintiff.

Munn, Liddy, Glaccum & Kane, of New York City (Feldman, Kittelle, Campbell & Ewing, of Washington, D. C., Orson D. Munn and Sylvester J. Liddy, both of New York City, and Sumner S. Kittelle, of Washington, D. C., of counsel), for defendant.

BURKE, District Judge.

The plaintiff brings this action to enjoin the defendant's use of its trade-mark "White House" associated with a picture of the Executive Mansion in connection with the sale of canned evaporated milk and similar products and for damages resulting from such use. The plaintiff and its predecessors have used the words "White House" associated with a picture of the White House in connection with the sale of coffee continuously since 1888 and have done a nation-wide business. Sometime prior to 1910 its use was extended to tea. Registrations of the mark as applied to both tea and coffee were issued to plaintiff by the United States Patent Office in 1910. Such registrations are now in force. The defendant's predecessor, White House Milk Products Company, began to manufacture evaporated milk in 1917. In September, 1918, it filed an application with the United States Patent Office for registration of the trademark "White House" with a picture of the Executive Mansion for canned evaporated milk. Registration of the mark was issued to it in 1919. The company was reorganized in 1921 as the White House Milk Company. In 1922 it agreed to sell its business and trade-marks to the Great Atlantic and Pacific Tea Company. This agreement was carried out by a transfer of the assets to A & P Products Corporation, a subsidiary of the Tea Company. A & P Products Corporation, later by change of name, Quaker Maid Company, in 1935 assigned the good will of its business together with the trade-mark "White House" to the defendant, also a subsidiary of the Tea Company. The defendant and its predecessors have continuously since 1917 used the trade-mark "White House" associated with a representation of the White House in connection with the sale of

canned evaporated milk. Up to the time of the transfer, to A & P Products Corporation, its market was restricted to Wisconsin and several neighboring states. Since that time the product has been sold throughout the United States exclusively by the stores of the Tea Company.

The plaintiff claims defendant's use of the mark in connection with the sale of canned evaporated milk to be an infringement of its registered trade-mark and an invasion of its common law rights. The charge is that defendant's use of the mark is calculated to cause confusion in the minds of the purchasing public by causing the public to believe that defendant's product originates with the plaintiff and thus to place plaintiff's reputation in the defendant's control. Further it is charged that the defendant's use of the mark in connection with its product which is distributed exclusively by the Tea Company lays plaintiff's products open to the popular prejudice against chain stores and their products.

In 1936 plaintiff brought a proceeding in the United States Patent Office to cancel defendant's registration of the mark. That proceeding resulted in a decision of the Commissioner of Patents cancelling defendant's registration. On appeal the Court of Customs and Patent Appeals in May 1940 affirmed. 111 F.2d 490. This action was commenced in August, 1940.

The evidence establishes that there has been confusion in the minds of the purchasing public and the trade arising about 1930 as to the origin of the plaintiff's and defendant's products which has resulted in a fairly general belief that the plaintiff is a subsidiary of or in some way connected with the Tea Company. This belief caused a feeling of antagonism on the part of independent grocers toward White House coffee and either stoppage of orders for plaintiff's coffee or diminution of efforts to sell it. There is no doubt that defendant's label closely resembles that of plaintiff's. That was so when it was used by defendant's predecessor in 1917. The resemblance is principally accomplished by the use of the words "White House" accompanied by a representation of the White House in Washington. Plaintiff uses an all blue back-ground. Defendant and its predecessors have used a two-color combination. The early labels were dark blue on the upper half and light blue on the lower half. The later labels were dark blue on the upper half and white on the lower half.

The plaintiff knew as early as 1920 of the use by defendant's predecessor of the trade-mark "White House" associated with a representation of the White House in connection with the sale of evaporated milk and knew that the milk was being sold or that attempts were being made to sell it in Wisconsin and neighboring states to the same stores which handled White House coffee. That information had been furnished headquarters of the plaintiff in Boston by Mead, then production manager at the Chicago factory and later president of the plaintiff company. The plaintiff knew of the general use of the White House label in connection with the sale of evaporated milk by the defendant in 1928 or 1929 and knew that the product was being sold through the stores of the Tea Company. Shannon, who was then plaintiff's general sales manager, and Fitzpatrick, plaintiff's eastern sales representative, met in New York with Mylott, supervisor of purchases for the Tea Company. Shannon offered to pay the Tea Company a 5% advertising allowance if the Tea Company would purchase White House coffee for sale in its stores and advertise White House coffee in the store ads of that company. Fitzpatrick even suggested a combination advertising offer of White House coffee and White House milk. It was Fitzpatrick's idea that this combination offer would help plaintiff's sale of White House coffee. This suggestion was turned down by the Tea Company because it had its own brands of coffee. The conference resulted in an agreement between the plaintiff and the Tea Company. Thereafter under the agreement the Tea Company in newspaper ads told the public that White House coffee could now be purchased in all A & P stores. Thereafter and up to about three weeks before this suit was commenced the plaintiff sold its coffee to the Tea Company for sale in its stores with knowledge that the Tea Company was advertising and distributing White House milk and that it was using the trade-mark "White House" with a representation of the White House to identify the milk and that the product was being sold over the same counters to the same class of customers that purchased White House coffee. During all of this period White House milk was extensively advertised in A & P store ads. Frequently White House coffee and

White House milk were advertised in the same ad. All of this time plaintiff was paying the Tea Company an advertising allowance with knowledge that its product had been frequently advertised in A & P store ads where White House milk was also advertised.

It is to be noted that there is no evidence of any confusion as to the origin of plaintiff's or defendant's products in the minds of the purchasing public or of the independent grocers until plaintiff commenced to sell its coffee through A & P stores. The Tea Company had been selling evaporated milk identified by the White House label throughout its nation-wide stores since about 1923. Even if we assume that the plaintiff did not have knowledge of the use of the White House label by the defendant throughout this period from 1923 to about 1928 or 1929, when it began to sell its coffee through A & P stores, it is fair to say that if there had been confusion the plaintiff would have known of it and would have felt the effect of it on its sales. It solicited the Tea Company's business with knowledge that the Tea Company was a distributor of evaporated milk identified by the White House label, substantially the same label about which it now complains.

There is no evidence, indeed there is no charge, that the defendant has attempted to pass off its evaporated milk as a product of the plaintiff. The confusion as to the origin of the plaintiff's White House coffee and defendant's White House milk and the prejudice of the independent grocers growing out of the feeling that there was some connection between the producers of White House coffee and the Tea Company, came to the attention of Mead as president of the plaintiff in 1930. Independent grocers were disgruntled because White House milk was being offered for sale at cut prices in A & P stores in competition with standard brands of milk which they handled at higher prices. As a consequence they either stopped selling White House coffee altogether or failed to push its sale. Sales fell off sharply as early as 1932. The first word of protest made by anyone in behalf of the plaintiff against defendant's use of the White House label was made by letter of May 27, 1940, about three months prior to the commencement of this suit. During all of that time plaintiff was selling its coffee to the Tea Company for resale in its stores. Just three days before

this letter of protest its president by letter to the Tea Company urged it to purchase White House coffee and even after the letter of protest continued selling its coffee for distribution through A & P stores. Mead, as president of the plaintiff, as early as 1935 knew that the defendant was a wholly owned subsidiary of the Tea Company and for several years prior thereto, according to his own testimony, had reason to believe that it might have been. Yet he apparently took no steps to find out whether it was or not until 1935. He then ascertained it to be a fact through a Dun & Bradstreet report. But even with knowledge of the facts and knowing that the A & P stores were the exclusive distributors of evaporated milk identified by the White House label, plaintiff continued as before to distribute White House coffee through the A & P stores and raised no objection to the ads of the Tea Company where White House milk and White House coffee appeared together. Since 1929 when the plaintiff unquestionably had knowledge of defendant's use of the White House label to identify its evaporated milk, White House milk has been extensively advertised by the Tea Company through newspapers, radio, billboards, signs, circulars, display cards and magazines. This effort to build up good will for evaporated milk identified by the White House label was carried on with knowledge on the part of the plaintiff and without objection on its part.

■■ The cancellation proceeding cannot be construed as the equivalent of an objection to defendant's use of the White House mark for milk. All during that proceeding from its commencement in 1936 until its termination in May, 1940, and even after that, plaintiff was selling its coffee for distribution in A & P stores. In that proceeding there was at issue only defendant's right to statutory protection for the mark. It left unaffected the common law rights of both to the use of the mark. Emerson Electric Manufacturing Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 105 F.2d 908.

■ The conduct on the part of the plaintiff and its attitude over a course of years toward the use of the trade-mark "White House" as applied to evaporated milk makes it inequitable for this Court to interfere at this late date by enjoining its use. Plaintiff urges that it is clear that neither Mead nor, so far as is known, any other person connected with the plaintiff

ever saw the White House label as applied to evaporated milk, after the one instance in 1920, until 1928 or 1929. It seems incredible that this could be so. Wright who was president of the plaintiff in 1920 when White House milk was brought to his attention said that "he would watch the situation, that it was a small section up there and probably would die out". After the purchase of the White House milk business in 1922 by the Tea Company for its subsidiary, A & P Products Company, the latter company packed milk for old White House customers under the White House label until some time in 1923 and at the same time packed milk for the Tea Company under its A & P label. In the latter part of 1923 it adopted a combination A & P label and White House label during a period of transition from the A & P label to the complete White House label. It used this combination label until the latter part of 1926 or early 1927. From that time on, the White House label was used alone. Between the acquisition of the White House milk business in 1922 and the end of 1928, about a million and a half dollars had been spent for capital improvements in milk plants. Sales figures prior to 1927 were not available at the trial. The evidence is, however, that for the year 1927 over one hundred million cans of evaporated milk were produced using the White House label, representing a value of almost $8,000,000. For the year 1928, about one hundred and fifty million cans were produced using the White House label, representing a value of over $11,000,000. The business had been tremendously expanded since its acquisition in 1922. The product had been distributed in A & P stores throughout the United States. In view of all these facts the conclusion seems warranted that the plaintiff, engaged as it was in selling its products to the grocery trade, either knew of the use of the White House label in connection with the sale of evaporated milk even prior to 1928 or 1929 or in the exercise of diligence should have known of it and is chargeable with knowledge of its use. After 1929 there can be no doubt that it knew of its extensive use by the defendant. It was after that that the Tea Company carried on a comprehensive advertising campaign and vigorously pushed the sale of White House milk. Since 1929, $45,000 has been spent annually by the Tea Company in advertising White House milk. In addition thereto, the defendant itself has spent over $400,000 in advertising for the years 1935 to 1940 inclusive. Sales increased from $10,642,950 in 1929 to $14,719,995 in 1940. The defendant is now the second or third largest producer of evaporated milk in the world. This tremendous growth has taken place under the observation of the plaintiff at least since 1929 and probably even before that without a word of protest until May, 1940, about eleven years after it unquestionably knew of the wide use by the defendant of the White House mark and twenty years after it knew of the use of the mark by the Wisconsin company in a restricted area. It would be most unconscionable to allow the plaintiff to strike down at this time a business built up on the White House mark over a period of years while the plaintiff sat idly by and watched it grow to such gigantic proportions.

Plaintiff's explanation as to why no protest was ever made regarding defendant's use of the mark is quite unpersuasive. It might serve as a reason why plaintiff was reluctant or even unable to carry on expensive litigation to protect its mark but certainly it does not explain its complete silence in the light of defendant's open and notorious use of the mark over such a long period of time.

The plaintiff urges that laches even accompanied by acquiescence of long standing does not operate to deprive one whose mark has been infringed of the right to injunctive relief. The argument is based on cases such as McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828 and Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526. In both of those cases there was intentional use of the mark amounting to fraud on the same product by the one accused of infringement. In Menendez v. Holt, the Court said, at page 523 of 128 U.S., at page 145 of 9 S.Ct.:

"The intentional use of another's trademark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence, then, in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, *unless it has been continued so long, and under such circumstances, as to defeat the right it-*

*self*. [italics mine]. \* \* \* Acquiescence, to avail, must be such as to create a new right in the defendant. \* \* \*

"So far as the act complained of is completed, acquiescence may defeat the remedy on the principal applicable when action is taken on the strength of encouragement to do it; but so far as the act is in progress, and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise. At the same time, as it is in the exercise of discretionary jurisdiction that the doctrine of reasonable diligence is applied, and those who seek equity must do it, a court might hesitate as to the measure of relief, where the use by others for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand.

"But there is nothing here in the nature of an estoppel; nothing which renders it inequitable to arrest at this stage any further invasion of complainants' rights. \* \* \*"

The Court went on to point out that the evidence was positive that the plaintiffs continuously used the trade-mark, always asserted their exclusive right to it and never admitted any other's right to use it and in the instance of every person attempting to use it, when it came to their knowledge, was objected to and personal notice given and publication made in newspapers warning others against the use of imitating marks. Under such circumstances, the Court said that it was idle to talk of acquiescence.

In Creswill v. Grand Lodge Knights of Pythias, 225 U.S. 246, at page 260, 32 S. Ct. 822, at page 827, 56 L.Ed. 1074, the Supreme Court said: "We do not stop to consider whether the court was right under principles of general law in applying to organizations like those here involved the rules applicable to trademarks and trade-names and unfair competition in trade, a subject as to which there is conflict in the decisions, because, under the view we take of the case, we propose, for the sake of argument only, to indulge in the hypothesis that the conception which the court entertained on the subject was correct. It is indisputable that the court was clearly right, as a matter of law, in holding that a court of equity in any event would not afford relief where there had been such laches as would cause it to be inequitable to do so. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 35, 21 S.Ct. 7, 45 L.Ed. 60, 74. \* \* \*"

The rule was applied by the Circuit Court of Appeals for the Second Circuit in Landers, Frary & Clark v. Universal Cooler Corporation, 2 Cir., 85 F.2d 46, at page 49, where the court said: "\* \* \* When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be. No doubt if the defendant had gone ahead defiantly and fraudulently this would not count; nothing would. Menendez v. Holt, 128 U.S. 514, 532, 9 S. Ct. 143, 32 L.Ed. 526; Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 39, 21 S.Ct. 7, 45 L.Ed. 60. But it did not do that; the new management knew nothing of the protest, if it can be called such; it was morally innocent, and it was given repeated assurance that it might go ahead. Equity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all these years now to restore the parties to their relative positions at the outset."

It was again applied by the Circuit Court of Appeals for the Third Circuit in Procter & Gamble Co. v. J. L. Prescott Co., 102 F. 2d 773, where the court, although finding confusion as to the respective trade-marks and the products, denied relief to the prior user on the ground of laches and acquiescence basing its decision on the authority of Creswill v. Grand Lodge Knights of Pythias, supra.

The plaintiff now urges that the defendant pursued a bold scheme of fraud in the use of the mark from the beginning. An examination of the complaint discloses that there is no charge of fraud unless it is implied in the charge that the use of the White House label for milk was calculated to cause confusion in the minds of the purchasing public by generating a belief that defendant's product originates with plaintiff. The fraud was accomplished, according to plaintiff's argument, by the use of subsidiaries of the Tea Company to hide its machinations and by gradual simulation of plaintiff's label to almost complete identity between the two labels. The striking similarity between the two labels was present as early as 1917 when it was used by the original White House Milk Company. Any changes or embellishments thereafter were made for artistic effect and to make the label more attractive

to purchasers rather than with the idea of more closely approaching plaintiff's mark. It can hardly be argued seriously that anyone would be deceived by using A & P Products Company as a cloak to hide the identity of the Great Atlantic & Pacific Tea Company. It is common knowledge that for years its stores have been known as A & P stores. The White House label was exploited in the early years of its use by the Tea Company or its subsidiaries in a combination label displaying the A & P mark on the reverse side of the can where the White House mark appeared. When the White House business was purchased in 1922 the mark had already been registered in the United States Patent Office for four years and had been in continuous use in connection with the sale of milk for at least four years. The evidence is that it came to be adopted as a mark because the original home of the White House milk business was in Washington County, Wisconsin and that the original users of the mark for milk had no knowledge of its use for coffee. When prior use of the mark for milk came to the knowledge of the officers of the original White House company it purchased from the Mohawk Milk Company of Buffalo its rights growing out of such prior use and then proceeded to register the mark as applied to milk in the Patent Office. There is no evidence that the officers of the Tea Company knew in 1922 of the use of the mark "White House" for coffee but it seems reasonable to assume that they did because they were in the grocery business and presumably familiar to some extent with competing brands, at least those which had been long used and advertised. But such knowledge could have been completely consistent with good faith in the purchase. They could have honestly believed that the mark could be used for milk without any danger of confusing it or the product with plaintiff or its coffee, and, as far as the evidence goes, there was no confusion until about 1930. It was about that time that the prejudice against chain stores and their products began to become articulate. It was about a year before that plaintiff began to distribute its coffee through A & P stores. There are no facts sufficient to warrant a finding of fraud in defendant's adoption or use of the White House label for milk.

Plaintiff cites the authority of Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, as substantially controlling. In some respects the facts are strikingly similar. In both cases the marks are alike or nearly so. In both cases they were applied not to the same product but to products of the same class. Aside from the fact that the decision in that case was by a divided court the mark in dispute was arbitrary and distinctive and had never been used before except upon plaintiff's product and there could have been no motive in defendant's use of the mark but to capitalize on the good will already established for plaintiff's product. In the case of the White House mark there have been numerous users of the mark ·on a number of different products, many in the food classification. The various users of the White House mark adopted it, not with the idea of taking advantage of the plaintiff's good will, but because the name and picture of the White House have a wide popular appeal based on almost universal familiarity with the Executive Mansion.

Plaintiff has recently embarked upon the business of marketing canned peanuts and fruit juices under the White House mark. If successful here there is nothing to prevent its entering the evaporated milk business and marketing its product under the White House label, thus capitalizing without cost upon the good will for that product established at a large expenditure by the defendant over a period of years by the use of the White House label. A gross inequity and a potential fraud upon the public would thus be made possible by a decree of this court enjoining defendant's use of the mark. A court of equity should not lend its powers to make such an event feasible. Procter & Gamble Co. v. J. L. Prescott Co., supra.

Judgment for defendant dismissing the complaint.

Separate findings and conclusions are filed herewith. To alleviate so far as possible any existing confusion as to the origin of defendant's product the judgment shall contain a provision that the labels and advertising matter of the defendant, after present supplies are exhausted, where the words "White House" are used in association with a pictorial representation of the White House, shall have conspicuously printed thereon the following: "Not connected with any company using a similar name or brand".