GROVE LABORATORIES, Inc., v. BREWER & CO.

BREWER & CO. v. GROVE LABORATORIES, Inc.

Nos. 3316, 3317.

Circuit Court of Appeals, First Circuit.

April 11, 1939.

Cedric W. Porter, of Boston, Mass. (William Keane Small, of St. Louis, Mo., of counsel, George P. Dike and Dike, Calver & Gray, all of Boston, Mass., on the brief), for Grove Laboratories.

Claude R. Branch, of Boston, Mass. (Charles Ryan, of Boston, Mass., on the brief), for Brewer & Co.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

These are cross appeals from a final decree of the federal District Court for Massachusetts in a suit in equity brought by the plaintiff, the Paris Medicine Company, a Delaware corporation, against Brewer & Company, a Massachusetts corporation, to restrain the latter from using the letters "L P Q" upon its tablets and the labels on its boxes in the manufacture and sale of tablets as a medicinal remedy for the relief of colds, headaches, etc., charging infringement and unfair competition, and praying for damages and profits. The bill was filed on June 21, 1934, and, among other allegations, it was alleged in sections 4 and 6:

"4. That plaintiff is the sole manufacturer of a medicinal remedy for the relief of colds, fever, headache and neuralgia sold under the denomination 'Laxative Bromo Quinine' and is the sole and exclusive owner of a certain trademark consisting of the letters 'L. B. Q.', which is a contraction of said denomination and applied to said remedy by being printed on the boxes thereof and impressed upon the tablets contained in said boxes as shown by the specimen box and tablets filed herewith and made part hereof marked 'Plaintiff's Exhibit 1'; that said remedy so denominated and marked has been manufactured and sold exclusively by plaintiff and its predecessor, Paris Medicine Company, a Tennessee corporation, in interstate commerce, continuously since about February 1, 1893, or earlier; that the name and address of plaintiff or of its predecessor has always been conspicuously printed upon the boxes containing said remedy in association with said denomination and trade-mark; that said trade-mark was first registered in accordance with the Statutes of the United States by plaintiff's said predecessor under date of January 4, 1898, as evidenced by certificate No. 31,087; that said trade-mark was subsequently registered by said predecessor in accordance with said Statutes under date of May 2, 1899, as evidenced by certificate No. 32,-803; and that said trade-mark was registered by plaintiff in accordance with said Statutes under date of October 24, 1933, as evidenced by certificate No. 307,417, and also registered by plaintiff in accordance with the laws of the State of Massachusetts under date of October 23, 1933, as evidenced by certificate No. 11813. Certified copies of said certificates are filed herewith and made part hereof, marked, respectively 'Plaintiff's Exhibits 2', '3', '4' and '5'."

"6. That said trade-mark 'L. B. Q.' has at all times since the date of its adoption, as aforesaid, been applied to said remedy by plaintiff and its said predecessor, exclusively, in the manner described

in the preceding clause number 4 hereof and that the labels affixed to the boxes of said remedy have at all times carried the statutory notice 'Trade-Mark Registered in U. S. Patent Office' substantially as shown by the specimen box above referred to as Plaintiff's Exhibit 1; that for the purpose of further distinguishing and enabling dealers and the purchasing public to readily identify said remedy plaintiff and its said predecessor have continuously produced the same in the form of small tablets weighing approximately four and one-half (4½) grains each, having convex formation and of distinctive color substantially as shown by the tablets forming part of Exhibit 1."

The defendant in its answer denied the validity of the plaintiff's trade-mark, registered or otherwise, but admitted among other things, "the issuance of the certificates of the several trade-mark registrations referred to in said paragraph 4"; denied infringement; and alleged that it had a trade-mark in the words "Laxative Phospho Quinine" registered June 8, 1928, in the United States Patent Office, No. 246,-444; also that the plaintiff was barred by acquiescence and laches from maintaining its suit and that it was estopped to do so.

Since the suit was brought the corporate name of the plaintiff has been changed to the Grove Laboratories, Inc.

January 16, 1935, the plaintiff amended its bill and further alleged that the defendant infringed its trade-mark "L B Q" by the use of the letters "L. D. Q." upon the labels of its boxes in the sale of like tablets, but this claim is now abandoned.

In the District Court it was adjudged (1) that the plaintiff was the sole owner and entitled to the exclusive use of the trade-mark "L B Q" as applied to medicinal tablets for the use of colds, etc., and that it was a good and valid trade-mark; (2) that the defendant had infringed the plaintiff's trade-mark by manufacturing and selling medicinal *tablets* for the relief of colds, etc., which were embossed or stamped with the letters "L P Q"; (3) that the use by the defendant and its *vendees* of the letters "L P Q" on its *labels* was not an infringement of the plaintiff's trade-mark; (4) directed that a permanent injunction issue enjoining the defendant from making, compounding, advertising, selling, offering for sale, or in any manner disposing of any medicinal *tablets* embossed or stamped or otherwise marked with the letters "L P Q" or any combination of such letters, but that the injunction should not restrain it from making and selling any medicinal tablets *not so embossed or stamped,* in boxes or containers with *labels* bearing the letters "L P Q" and the words "Laxative Phospho Quinine"; and (5) denying other relief in the way of damages and an accounting.

All the evidence was taken by depositions and the case was submitted upon the evidence thus taken and the briefs of counsel. Although objections to some of the evidence were noted before the magistrate they were not pressed for rulings by the court. No such rulings having been made, no exceptions were or could have been saved or errors assigned to the admission of the evidence. This being so all the evidence introduced, so far as it is relevant to any issue in the case, is open to consideration; and no witness having testified before the District Court we are in as good a position to pass upon the weight of the evidence and the credibility of the deponents as it was.

When the case was previously before this court we were of the opinion that the words "Laxative Bromo Quinine" printed upon its labels in connection with the letters "L B Q" were descriptive of the ingredients contained in the tablets, and that the letters "L B Q," being a contraction of the words "Laxative Bromo Quinine" and used in connection therewith for many years on the labels, were likewise descriptive and not the subject of a technical common-law trade-mark. And because of findings by the District Court and statements of plaintiff's counsel affecting registrations No. 30,753, of October 26, 1897, and No. 31,087, issued January 4, 1898, each of which purported to have been applied for by a corporation described as the Paris Medicine Company, organized under the laws of Missouri, we were led to believe that there was a Missouri corporation antedating the Paris Medicine Company of Tennessee. And as each of these registrations stated that "This trade-mark has been used continuously by said corporation [the Missouri corporation] since about February 1, 1893," and registrations No. 32,803 (issued to the Paris Medicine Company of Tennessee May 2, 1899), and No. 307,417 (issued to the Paris Medicine Company of Delaware October 24, 1933), contained the same or substantially the same statement as that above set forth from the prior registrations to the Missouri corporation,

we held that registrations No. 32,803 and No. 307,417, relied upon by the plaintiff, were invalid because of the false statements they contained. But at the rehearing it was contended that there never was a corporation known as the Paris Medicine Company of Missouri, and that registrations No. 30,753 of 1897, and No. 31,087 of 1898 were ineffective for any purpose. And later it was brought to our attention that the record showed that the Paris Medicine Company of Tennessee was incorporated August 20, 1889, and that defendant's counsel, in cross-examination of plaintiff's witness Curran, brought out the fact that the first corporation having "The Paris Medicine Company as a part of its corporate name", was the Tennessee corporation. It was principally due to these matters that the rehearing was granted, at which the parties were heard anew on all the issues in the case.

 In view of the foregoing facts it is apparent that registrations No. 30,753 and No. 31,087 are irrevelant and do not render registrations No. 32,803 and No. 307,417 invalid on the ground that they contain a false statement as to the time that the trade-mark "L B Q" had been used by the Paris Medicine Company of Tennessee and its successor, the Paris Medicine Company of Delaware. On the contrary we regard each of them valid, for, as we shall later point out, at the time they were registered, the Paris Medicine Company of Tennessee and the Paris Medicine Company of Delaware each had a valid trade-mark in the letters "L B Q" either at common law or as protected by registrations under the Acts of 1881 and 1905, they having come to denote origin.

 We think we erred in holding that the letters "L B Q" enclosed in a circle were merely descriptive. The letters. as thus arranged and embossed on the *tablets* are not in themselves descriptive of the ingredients which the tablets contain, but are arbitrary and fanciful. It is only when they are used on the *labels* in association with the words "Laxative Bromo Quinine" that one is led to inquire whether they may or may not be descriptive. But being arbitrary and fanciful when adopted and embossed upon the tablets we think that they do not lose that character when printed on the label, enclosed in a circle. And, if not, the plaintiff and its predecessor had a valid common-law trade-mark in the letters "L B Q". But whether de-

scriptive or not they have come to denote origin in the mind of the public through their long continued use by the plaintiff and its predecessor on the tablets and labels in the sale of the remedy, and can properly be registered under the Trade-Mark Acts of 1881, 21 Stat. 502, and 1905, 15 U.S.C.A. § 81 et seq.

In the recent case of Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, an Illinois corporation, and Nu-Enamel Corporation, a Delaware corporation, intervenor, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. ——, decided by the Supreme Court December 5, 1938, it appeared that the Nu-Enamel Corporation of Illinois filed its bill in the federal District Court for Illinois to enjoin the Armstrong Paint and Varnish Company, a corporation of the same state, from using in the sale of paints, varnishes and similar goods the words "Nu-Beauty Enamel" in infringement of the plaintiff's prior trade-mark "Nu-Enamel". It there appeared that the plaintiff had registered "Nu-Enamel" under the Act of March 19, 1920, for mixed paints, varnishes, etc. The bill alleged that the name "Nu-Enamel" through wide use by the plaintiff had come to mean the plaintiff and the plaintiff's products only; that the defendant had adopted the name "Nu-Beauty Enamel" with full knowledge of the prior and extensive use by the plaintiff of "Nu-Enamel"; that as a result of the defendant's use of the words "Nu-Beauty Enamel" merchants passed off defendant's products for plaintiff's and that the products of both manufacturers were sold in interstate commerce; and that the plaintiff used its mark with the slogan "The coat of enduring beauty" printed above it.

The defendant admitted that the name "Nu-Enamel" had come to mean throughout the United States, including Illinois, the plaintiff and plaintiff's products only, and was a mark by which the goods of the plaintiff were distinguished from other goods of the same class, but denied the validity of the registration and asserted that "Nu-Enamel" was a descriptive term, and that it had adopted "Nu-Beauty" in connection with the word "Enamel" before it had heard of the trade-mark or trade name "Nu-Enamel"; and that it marketed only enamels under the designation "Nu-Beauty Enamel"; and denied the jurisdiction of the court over the subject matter.

The District Court held that "Nu-Enamel" was not a valid trade-mark either

under the trade mark acts or at common law, and, having so determined, refused jurisdiction of unfair competition. On appeal the Circuit Court of Appeals, 7 Cir., 95 F:2d 448, reversed the District Court; held the trade-mark non-descriptive, valid and infringed; that the mark had acquired a secondary meaning and that the defendant's conduct enabled the merchandise to be palmed off as and for Nu-Enamel; and concluded that the District Court had jurisdiction of unfair competition.

The Supreme Court granted certiorari to review the question of the descriptive character of the trade-mark and the effect of its acquired meaning under the Trade-Mark Act of 1920, 15 U.S.C.A. § 121 et seq. It held that, inasmuch as the defendant in its answer conceded the words "Nu-Enamel" had through use come to mean the plaintiff and plaintiff's products only and distinguished the plaintiff's goods from others of the same class, no further proof was needed to establish those facts; that under the Trade-Mark Act of 1920, the registration of "Nu-Enamel" created no new substantive rights in registrant, and a trade-mark registered under that Act could be attacked collaterally; that the Act forbids the unauthorized use of the registered mark in foreign and interstate commerce and adopts the procedural provisions of the Trade-Mark Act of 1905, 15 U.S.C.A. § 81 et seq.; that under the procedural provisions of the Act of 1905 the lower courts were given original and appellate jurisdiction of all suits in law or equity respecting trade-marks registered in accordance with the provisions of the Act of 1920; and that the Supreme Court was given jurisdiction for certiorari as in patent cases; that Section 19 of the 1905 Act was applicable to proceedings under the 1920 Act; and that by Section 23 remedies in law and equity were left available; that the significant distinction between the two Acts is the omission from the 1920 Act of the provision in Section 16 of the 1905 Act making the registration prima facie evidence of ownership; that Section 1, paragraph (b) of the 1920 Act, provided for registration of marks not registrable under Section 5 of the Act of 1905, after one year's use in interstate commerce; that, while the Act of 1920 did not vest any new substantive rights it provided remedies in the Federal courts for protecting registrations and authorized triple damages for infringement; that, as a consequence, when a suit was begun for infringement, bottomed on registration under the 1920 Act; the District Court had jurisdiction, and, unless the allegation of registration under the Act. was clearly unsubstantial, it was sufficient to give jurisdiction of the merits; that, where the jurisdiction of a cause of action is the alleged infringement of a trade-mark, and is once properly obtained, it persists to include unfair competition with the marked article; that if it was a properly registered trade-mark the cause of action consisted in its violation and if it was not a properly registered trade-mark, the ground of action was unfair competition at common law; and that in either case the wrong complained of was the violation of the right to its exclusive use.

It is then pointed out that the registration of "Nu-Enamel" furnished a substantial ground for Federal jurisdiction and that that jurisdiction should be continued to determine the issue of unfair competition.

The court then considered the question whether the mark "Nu-Enamel", being descriptive and having acquired a secondary meaning, was registrable under the Act of 1920, for Section 1(b) of that Act permitted registration of marks used for one year in interstate commerce, which were not registrable under the Act of 1905 "except those specified in paragraphs (a) and (b)" of the Act. It held, that although the mark "Nu-Enamel" was descriptive of paint enamels, that did not bar it from registration as to them under the Act of 1920; that to construe Subsection (b) of Section 1 of the Act of 1920 to bar names, descriptive marks, and merely geographical terms would make the subsection useless, and construed it to bar the categories expressed in Section 5 of the Act of 1905 under (a) and (b), including the first proviso, but not to include the other provisos of (b). It then points out that it is the owner, whose rights of action under Act 1920 are preserved "unaided by any presumption from registration" and that under it ownership must be established; and that it is established by proof that a descriptive term employed in trade has come to denote origin; that the owner may then register his mark and avail himself of the remedies afforded by the Act, including that of infringement of a trade-mark; that the defendant was justified in conceding that the name "Nu-Enamel" means the plaintiff and the plaintiff's products only and was to distinguish its goods from others of the same class; that the name "Nu-Enamel", though descriptive, had acquired a secondary meaning and "establishes, entirely apart from any trade-mark

act, the common law right of the Nu-Enamel Corporation to be free from the competitive use of these words as a trade-mark or trade name"; that while "this right of freedom does not confer a monopoly on the use of the words", it confers a "protection against their unfair use as a trade-mark or trade' name by a competitor seeking to palm off his products as those of the original user of the trade name"; that "this right to protection from such use belongs to the user of a mark which has acquired a secondary meaning"; that "he is, in this sense, the owner of the mark." And concludes: "We agree with the conclusion of the Circuit Court of Appeals that infringement is shown."

The first registration (No. 32803, issued to the Paris Medicine Company of Tennessee May 2, 1889), upon which the plaintiff relies in this case, was issued under the Trade-Mark Act of 1881 (21 U.S.Stat. 502). Section 1, 2 and 3 of that Act provide:

Sec. 1. "That owners of trade-marks used in commerce with foreign nations, or with the Indian tribes, provided such owners shall be domiciled in the United States, or located in any foreign country or tribes which by treaty, convention or law, affords similar privileges to citizens of the United States, may obtain registration of such trade-marks by complying with the following requirements:

"First. By causing to be recorded in the Patent Office a statement specifying name, domicile, location, and citizenship of the party applying; the class of merchandise and the particular description of goods comprised in such class to which the particular trade-mark has been appropriated; a description of the trade-mark itself, with facsimiles thereof, and a statement of the mode in which the same is applied and affixed to goods, and the length of time during which the trade-mark has been used.

"Second. By paying into the Treasury of the United States the sum of twenty-five dollars, and complying with such regulations as may be prescribed by the Commissioner of Patents.

"Sec. 2. That the application prescribed in the foregoing section must, in order to create any right whatever in favor of the party filing it, be accompanied by a written declaration verified by the person, or by a member of a firm, or by an officer of a corporation applying, to the effect that such party has at the time a right to the use of the trade-mark sought to be registered, and that no other person, firm, or corporation has the right to such use, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that such trade-mark is used in commerce with foreign nations or Indian tribes, as above indicated; and that the description and facsimiles presented for registry truly represent the trade-mark sought to be registered.

"Sec. 3. That the time of the receipt of any such application shall be noted and recorded. But no alleged trade-mark shall be registered unless the same appear to be lawfully used as such by the applicant in foreign commerce or commerce' with Indian tribes as above mentioned or is within the provision of a treaty, convention, or declaration with a foreign power; nor which is merely the name of the applicant; nor which is identical with a registered or known trade-mark owned by another and appropriate to the same class of merchandise, or which so nearly resembles some other person's lawful trade-mark as to be likely to cause confusion or mistake in the mind of the public, or to deceive purchasers. In an application for registration the Commissioner of Patents shall decide the *presumptive lawfulness of* claim to the alleged trade-mark; and in any dispute between an applicant and a previous registrant, or between applicants, he shall follow, so far as the same may be applicable, the practice of courts of equity of the United States in analogous cases."

Section 5 provides that "a certificate of registry shall remain in force for thirty years from its date"; Section 7, that "that registration of a trade-mark shall be prima facie evidence of' ownership", and that any person who "shall * * * colorably imitate any trade-mark registered under this act and affix the same to merchandise of substantially the same descriptive properties as those described in the registration, shall be liable to an action on the case for damages for the wrongful use of said trade-mark, at the suit of the owner thereof"; and "the party aggrieved shall also have his remedy according to the course of equity to enjoin the wrongful use of such trade-mark used in foreign commerce," etc., and that the "courts of the United States shall have original and appellate jurisdiction in such cases without regard to the amount in controversy".

■■ While there is a presumption due to the issuance of registration No. 32,803 that all the requirements of the Act of 1881 preliminary to the granting of the registration had been complied with, the evidence shows that. those requirements had in fact been complied with, and we so find.

Registration No. 32,803 was based on an application, accompanied by a declaration subscribed and sworn to by .the vice-president of the Paris Medicine Company of Tennessee. In that application it was stated that the Paris Medicine Company was a corporation created and existing under the laws of the State of Tennessee, having its chief office and place of business at St. Louis, Missouri; that it had adopted for its use as a ' trade-mark on remedies for coughs, colds, etc., the letters "L B Q"; that they had usually been arranged as shown ·in the accompanying fac simile in which is shown the letters "LBQ" surrounded by a circle in elevation on a tablet; that the essential feature was the letters "L B Q": that the trade-mark had been used continuously by said corporation since about February 1, 1893; that the class of merchandise to which the trade-mark was appropriated was medical compounds and the .particular description of goods comprised in said class on which it is used by the corporation is remedies for coughs, colds, headaches, and la grippe; that the mark is applied to the tablet containing the remedy either by pressing the compound and producing the letters in elevation or by pressing the compound and producing the letters in depression; and that "it was also used upon advertising matter and office stationery." In the sworn declaration the declarant stated that he was vice-president of the corporation, the applicant named in the foregoing statement; that he verily believed that the foregoing statement was true as to the recitals contained therein and the facts stated; that said corporation had at that time a right to the use of the trade-mark described; that no other person, firm or corporation had a right to use the same, either in the identical form or in any such near resemblance thereto as might°be calculated to deceive; and that it was used by· said corporation in commerce between the United States and Canada and that the description and facsimile presented for record truly represented the trade-mark sought to be registered.

■ What we have just recited shows, as above stated, that the Paris Medicine Company of Tennessee, the plaintiff's predecessor, by its application and sworn statement complied with the requirements of Sections 1, 2 and 3 for registration under the Act of 1881, and the registration having issued, that the Commissioner of Patents, under the provisions of Section 3, "decided the presumptive lawfulness of the claim [of the Paris Medicine Company of Tennessee] to the alleged trade-mark." And being properly registered under the provisions of the Act its registration is prima facie evidence of ownership by the Paris Medicine Company of .the trade-mark.

■ This Act does not in terms or by reasonable implication exclude from registration a descriptive mark if the party applying had at the time a right to the use of the mark sought to be registered and no other person, firm or corporation had the right to such use "either in the identical form or in any such near resemblance thereto as might be calculated to deceive." At any rate we do not think that the word "trade-mark" as used in the Act of 1881 was used in any more restricted sense than it is in the Act of 1920, which the Supreme Court had under consideration,—in fact not in so restricted a sense, for the Act of 1920 was more restricted in this regard than the Act of 1881.

■ Furthermore the evidence in this case shows and we find that the mark "L B Q" was appropriated and used by the Paris Medicine Company of· Tennessee on its tablets and the labels on its boxes in the sale of its remedy and had been so used by that corporation from about February 1, 1893, to May 2, 1899, when registration No. 32,- 803 issued; that, during that time, it had sold thousands of tablets yearly and the demand for the same grew more and more from year to year until 1897, when the sales amounted to more than eight million tablets a year, the same being sold throughout the United States and in trade with Canada and other foreign countries; that, during the period from the time it was first placed on the market until December 30, 1897, the Tennessee Company had expended for advertising the same over $100,000 and before 1900 more than $300,000; and since then it and its successor have expended millions of dollars in advertising the remedy.

The District Court found, and we find, that the letters "L B Q" as used in connection with' the manufacture and sale of the tablets had, in the mind of the public, come

to denote origin and ownership of the tablets by the Paris Medicine Company of Tennessee, at the time it applied for and obtained registration No. 32,803, May 2, 1899, and distinguished its remedy from others of the same class.

Under the Act of 1881 the burden is not upon the party to whom registration is granted to prove ownership, for the registration of a mark under that Act is prima facie evidence of ownership. The burden is on the defendant to disprove ownership. As to this the defendant went no further than to contend that the mark was descriptive. It produced no evidence to show that it had not come to denote origin or that the Paris Medicine Company of Tennessee, at the time it applied for and received its registration (No. 32,803), had not the right to use the mark sought to be registered or that others had the lawful right to use it or make use of it. What it proved was that one of its predecessors, Billings-Clapp Company, later adopted the letters "L P Q" and used them in marketing its remedy, embossed on its tablets and printed on the labels of its boxes. It attempted to prove that Billings-Clapp Company adopted and used the letters "L P Q" as early as 1902. But we find that there is no clear and convincing evidence that they did so before 1904, which the catalogue of that company issued in 1904 discloses.

It is also contended by the defendant that its predecessor, Billings-Clapp Company, adopted and used the mark "L P Q" in good faith and without knowledge of the plaintiff's use of the letters "L B Q" on its tablets and labels. But we find that this is not true and for reasons hereafter stated.

The Paris Medicine Company of Delaware was incorporated December 1, 1919, and shortly thereafter took over all the business and property of the Paris Medicine Company of Tennessee, including its good-will. It also took an assignment of registration No. 32,803 and had it duly recorded. Thereafter, on June 10, 1933, it applied for registration, under the Act of February 20, 1905, 15 U.S.C.A. § 81 et seq., of the letters "L B Q" enclosed in a circle, and on October 24, 1933, registration No. 307,417 was issued to it for this mark. In its application the Delaware Corporation stated that "The trade-mark has been continuously used by the applicant and applicant's predecessors from whom title is derived, since about February 1, 1893";

and is "usually employed by means of a printed or lithographed label or wrapper placed upon the boxes in which the goods are packed."

Under the Act of 1905, as under the Act of 1881, it is presumed, from the issuance of registration, that all the requirements of the Act preliminary to registration had been complied with (see Sections 6, 7, 8 and 9 of Act 1905), and, in the absence of any evidence to the contrary, we find that they were in fact complied with.

The act of 1905 in its first four sections does not differ materially from the provisions of the Act of 1881, except that in Section 1 the owner of a trade-mark domiciled in the United States is allowed registration where the trade-mark is used in commerce among the several states, as well as where it is used in commerce with foreign nations and with the Indian tribes. Section 5 provides:

Sec. 5. "No mark by which the goods of the owner of the mark may be distinguished from other goods of the same class shall be refused registration as a trade-mark on account of the nature of such mark—" and then goes on in subsections (a) and (b) and the first proviso to designate what marks shall not be registered at all under the Act; and in the *second proviso* states that "no mark which consists * * * *merely* in words or devices which are *descriptive* of the goods with which they are used, * * * shall be registered under the terms of this subdivision." The first sentence and the second proviso are, without doubt, the provisions of the Act of 1905 under which registration No. 307,417 of October 24, 1933, was issued. When these two provisions are read in connection with one another it is apparent that by them it was intended to restrict only the registration of a mark that is merely descriptive of the goods with which it is used, not one which, by use on a particular class of goods, had come to denote origin; that such a mark is not merely descriptive but one of the character that the first sentence of Section 5 provides should not be "refused registration", for, having come to denote origin, it had come also to distinguish the goods of the plaintiff from goods of others of the same class. We regard this registration as having been properly issued and as protecting the plaintiff's right in the mark.

The remedial provisions of the 1905 Act are found in Sections 16, 17, 18, 19, and 23. Section 16, like Section 7 of the Act of 1881, provides, among other things, that registration of a trade-mark under the provisions of the Act shall be prima facie evidence of ownership, and in Section 29 that "The term 'trade-mark' includes any mark which is entitled to registration under the terms of this subdivision of this chapter and whether registered or not * * *."

■■■ There can be no doubt that the letters "L B Q", shown to have been used by the plaintiff and its predecessor continuously for about forty years at the time registration No. 307,417 of October 24, 1933, was issued, and in connection with the sale of their medicinal remedy, had in the mind of the public come to denote origin and ownership by the plaintiff, as well as by the Paris Medicine Company of Tennessee, and to distinguish its remedy from others of the same class.

As to the question of infringement it appears that the defendant's tablets are of the same color, size, shape and thickness—being thicker at the center than at the edge the same as the plaintiff's are; and, like the plaintiff's, have the letters "L P Q" embossed upon them—not depressed. The labels of the defendant's present box bear the letters "L P Q". They also bear the words "Laxative Phospho Quinine", the words "½ Gr. Acetanilid in each Tablet," and "Used for Colds and Simple Headaches". The plaintiff's labels, in addition to having thereon the letters "L B Q", and "Laxative Bromo Quinine", have the words "Each Tablet contains 1 Grain Acetanilide", and also the words "For Colds and Simple Headaches".

It is to be noted, in considering this question, that the plaintiff's label was adopted and used for a number of years prior to the adoption and use of the defendant's label and the remedy was widely advertised and sold throughout the United States, and particularly the New England states and the larger cities like Boston, where Billings-Clapp Company conducted its business, and Worcester, where Brewer & Company did the same. And it is difficult to believe that Billings-Clapp Company, when it adopted the label, and Brewer & Company, when, as the evidence shows, it changed from time to time the words on the label, did not have before them the plaintiff's label both at the time of the adoption and when the changes were

made in the language employed on the label. The letters "L P Q", both in appearance and sound, are strikingly like the letters "L B Q", as are the words "Laxative Phospho Quinine" like "Laxative Bromo Quinine." The letters, taken in connection with the attendant words, are certainly a colorable imitation likely to deceive an intending purchaser of the plaintiff's remedy; and it is not to be forgotten that while the present label of the plaintiff bears the words "Each tablet contains 1 Grain Acetanilide", both kinds of the defendant's labels bear the words "½ Gr. Acetanilid in each Tablet"; and while the plaintiff's label states "For Colds and Simple Headaches" the defendant's present label says "Used for Colds and Simple Headaches".

Back in 1904, when Billings-Clapp Company adopted its label bearing the words "Laxative Phospho Quinine" and the letters "L P Q", we find that the plaintiff's label had then for some years borne the words "Laxative Bromo Quinine", the letters "L B Q", and the words "For La Grippe and Colds", and also the words, "Does not affect the Head like Sulphate of Quinine"; while the label as adopted by Billings-Clapp Company bore also the words "For La Grippe, Colds, etc." and the words "Superior to Sulphate of Quinine in every way". The adoption of these two last phrases shows that Billings-Clapp Company undoubtedly had the label of the Paris Medicine Company before it at the time it adopted its label. It will be noted that at that time neither the Billings-Clapp label nor the label of the Tennessee Company said anything about the tablet of either party containing "1 Grain Acetanilide" or "½ Gr. Acetanilid", or anything about their being used "For Colds and Simple Headaches". But the evidence shows that in 1912 the plaintiff's predecessor changed from "La Grippe and Colds" to "Colds and Simple Headaches"; and added the words "Each Tablet contains 1 Grain Acetanilide" and left off the phrase "Does not affect the head like Sulphate of Quinine", and thereafter Brewer & Company (who in 1911 had acquired the rights of Billings-Clapp Company) changed its label from "La Grippe, Colds, etc." to "For Colds and Simple Headaches", added "½ Gr. Acetanilid in each Tablet", and left off the words "Superior to Sulphate of Quinine in every way."

When one considers these facts, all of which appear on the respective labels dur-

ing the period from 1902 down to the bringing of this suit, he cannot reasonably believe that Billings-Clapp Company in 1904 adopted its label in good faith, without knowledge of the label of the plaintiff's predecessor, and with no intention of invading the rights of its owner. And the same is true in regard to Brewer & Company during the period from 1912 to the bringing of this suit, for its acts in changing the statements on its labels to meet the changes on the labels of the plaintiff's predecessor, as above noted, show that it was fully informed about the plaintiff's predecessor's label and the changes made in it, and changed its labels so that they would more readily deceive the purchasing public and injure the good-will of the owner of the mark.

In other words Billings-Clapp Company adopted its label with the purpose and intention of invading the Paris Medicine Company's good-will and deceiving the purchasing public, and Brewer & Company made the changes in its labels for the same purpose and with the same intent.

 Our conclusion is that the defendant has infringed the plaintiff's registered trade-mark and has done so wilfully and with an intention to defraud.

 We are satisfied that neither the plaintiff nor its predecessor ever lost its trade-mark rights in "L B Q" by abandonment, non-user, laches or acquiescence. As said by the Supreme Court in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, at page 419, 36 S.Ct. 357, at page 362, 60 L. Ed. 713:

"Abandonment, in the strict sense, rests upon intent to abandon; and we have no purpose to qualify the authority of Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 31, 45 L.Ed. 60, 73, 21 S.Ct. 7, to that effect. As to laches and acquiescence, it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiffs' rights, that relief by injunction would be accorded although an accounting of profits should be denied. McLean v. Fleming, 96 U.S. 245, 257, 24 L.Ed. 828, 833; Menendez v. Holt, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526, 528; Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 39, 21 S.Ct. 7, 45 L.Ed. 60, 76. So much must be regarded as settled."

 We are also satisfied that the plaintiff is not estopped to assert infringement of its mark, for the defendant to the extent that it has built up its trade has not done so in good faith and without notice of the plaintiff's mark, but with knowledge and in fraud of the plaintiff's rights. Hanover Star Milling Co. v. Metcalf, supra, 240 U.S. page 419, 36 S.Ct. 357, 60 L.Ed. 713.

 About two years after this suit was brought and the defendant's answer filed, the defendant presented a motion for leave to amend its answer and to set up as a further defense that the plaintiff had regularly inserted in its boxes of tablets a circular containing statements as to the nature and effect of its tablets, which the defendant averred were misleading and likely to deceive the public. This motion was denied, subject to exception. This is assigned as error. The answer to this is that it was discretionary with the court whether it would allow the amendment or not, and nearly two years having elapsed since the suit was begun and the answer filed, no abuse of discretion is shown.

 It is also assigned as error that the District Court "erred in refusing to rule that the plaintiff was not entitled to relief in a court of equity because it had, in its advertising and leaflets enclosed in its packages, misrepresented the efficacy of its tablets in the treatment of colds and other disorders." The court did not err in refusing to rule that the plaintiff was not entitled to relief on this ground. Whatever evidence the depositions may have contained bearing upon this question was not open to consideration, for it was not relevant to any issue in the case raised by the answer, the proposed amendment not having been allowed.

Our prior decree of September 27, 1938, is vacated; the decree of the District Court is vacated, and it is ordered: (1) that the plaintiff is the sole owner and entitled to the exclusive use of the trade-mark "L B Q" as applied to medicinal tablets for colds, headaches, etc., and as applied to the labels on its boxes; (2) that it has a good and valid registered trade-mark and that the defendant has infringed plaintiff's trade-mark by manufacturing and selling medicinal tablets for the relief of colds, etc., embossed or stamped with the letters "L P Q", and in selling and disposing of medicinal tablets for the relief of colds, etc., not so embossed or marked, in boxes stamped or marked with the letters "L P Q"; (3) that a permanent injunction issue

enjoining the defendant from making, compounding, advertising, selling, offering. for sale, or in any manner disposing of any medicinal tablets embossed or stamped or otherwise marked with the letters "L P Q" or any combination of such letters, and from selling or offering for sale or in any manner disposing of any medicinal tablets, not so embossed or stamped or marked, in boxes stamped or marked with the letters "L P Q" or any combination of such letters, with or without the words "Laxative Phospho Quinine" printed or stamped thereon; and (4) that all other relief in the way of damages or an accounting is denied.

The plaintiff will recover costs in this court and the court below.