HAMILTON WATCH CO. v. HAMILTON
CHAIN CO., Inc., et al.

C. A. No. 31.

District Court, D. Rhode Island.

Jan. 15, 1942.

Herbert B. Barlow, of Providence, R. I., and Robert Cushman (of Roberts, Cushman & Woodberry), all of Boston, Mass., for plaintiff.

Nathaniel Frucht, Thomas J. Flynn, and Arthur H. Feiner, all of Providence, R. I., and Herbert B. Ehrmann, of Boston, Mass., for defendants.

HARTIGAN, District Judge.

This is a suit for alleged trade-mark infringement and for unfair competition.

The plaintiff, Hamilton Watch Company, of Lancaster, Pennsylvania, is a Pennsylvania corporation.

Hamilton Chain Co., Inc., Young's Inc., and S. & S. Manufacturing Company are Rhode Island corporations. Alfred Spear and Louis Susskind are citizens of Rhode Island. All the defendants occupied the same place of business at 7 Eddy Street in Providence, and are so closely related that for practical purposes in this suit they will be referred to as the defendants.

The Hamilton Chain Co., Inc. goods include Waldemar chains, vest chains, bracelets, rings, neck chains, lockets, brooches, pendants, and earrings, and as Spear testified "everything in the line of jewelry outside of watches." These goods are sold under the "Hamilton" name mainly to retail jewelers.

The S. & S. Manufacturing Company is a corporation controlled by Spear and his partner Susskind. The record discloses the death of Mr. Susskind on December 30, 1940. The principal function of S. & S. Manufacturing Company is to buy merchandise for Spear's various concerns. It does not sell the trade but only to the other defendants.

Young's Inc. has not been active for three or four years and was established to do a mail order business in jewelry but was not successful.

Service of process was not made on Young's Inc. but it was stipulated and agreed by and between the attorneys for

the respective parties that the defendant Young's Inc. shall be considered a properly served party to this proceeding; that its appearance be entered herein and that the answer filed by the defendants shall be considered as the answer of Young's Inc. and all proceedings had herein shall be binding upon Young's Inc. with the same force and effect as upon other defendants in the suit.

Alfred Spear and Louis Susskind constituted the firm of Spear & Susskind and they dominated and directed the activities of the three corporate defendants and the firm operated as wholesalers of a line of jewelry selling direct to retail jewelers. They did not manufacture. Spear & Susskind for two or three years sold their "Hamilton" line of jewelry, using the business designation "Hamilton Chain Company" before they incorporated the "Hamilton Jewelry Co., Inc." in 1937.

The plaintiff alleges ownership of registration No. 203,657, dated September 22, 1925, for a trade-mark "Hamilton" for watches, watch movements and parts thereof and infringement of the registered trade name by the defendants' use of the name "Hamilton" on chains, bracelets, lockets, and other articles of jewelry. The plaintiff also alleges unfair competition and claims that the defendants fraudulently and with intent to deceive and palm off their goods, adopted and used the marks "Hamilton" and "Hampden" on jewelry.

On August 29, 1940, the plaintiff filed its "Voluntary Bill of Particulars" by which it gave notice that it will not claim the relief prayed for with respect to the word "Hampden".

The answer denies the various allegations of the complaint; denies the validity of the plaintiff's registered trademark; denies any trade-mark rights in the plaintiff with respect to the word "Hamilton" apart from watches, and denies any unfair competition. The defendants also counterclaim for trade-mark infringement and unfair competition alleging vested rights in the marks "Hamilton" and "Hampden" as applied to jewelry and infringement and unfair competition by the plaintiff.

The Hamilton Watch Company was incorporated in 1892. The name "Hamilton" was derived from a celebrated colonial family of that name who figured prominently in the history of eastern Penn-sylvania including Lancaster County. The name "Hamilton" has always been of historic note in that region and has been favored in the naming of local institutions. The Hamilton Watch Company's factory is located on land whose title has been traced back to the colonial estates of the Hamilton family.

From 1892 to 1909 the plaintiff manufactured and sold watch movements, including the dial and hands, to the jewelry trade without the watch case. The plaintiff did not put out a complete watch until 1909 when it began to encase the movements in watch cases which it purchased from outside manufacturers.

Up to 1914 the plaintiff's watches were the type known as pocket watches intended to be carried in the pocket usually attached to a watch chain, or in the case of a lady's watch, to be suspended from a neck chain or chatelaine. In 1914 the plaintiff began the manufacture and sale of wrist watches which were sold with a bracelet attached or ready to be attached in a box carrying the name "Hamilton". It was not until 1929 that the word "Hamilton" appeared on a metal bracelet as distinguished from a label or box. In 1927 or 1928 strap bracelets were marked with the name "Hamilton". About 1931 the name appeared on the clasps of ribbon bracelets of ladies' watches. In 1933 the name was put on the buckles of men's strap bracelets as well as on the bracelets.

The testimony concerning the markings on the dials from 1892 to 1905 is conflicting. They were marked "Hamilton Watch Co.", "Hamilton", and in some cases with the name of the distributor such as "Tiffany & Co."

The plaintiff's contention that the trade-mark "Hamilton" has always been placed on the dials of watches from the beginning is not convincing. The plaintiff offered in evidence eight dials (Ex. 79) with the name "Hamilton" in fine script and which Mr. Atkinson, a vice-president of the plaintiff company and in charge of sales and associated with the plaintiff since 1921, testified were made about 1895.

In 1937 the plaintiff marketed watches with Waldemar chains and Waldemar chains separately. The swivel of these chains were stamped "Hamilton". They were never catalogued or nationally advertised. Prior to 1937 plaintiff occasionally had orders for watches for presentation purposes for which it would supply watch

chains. Such chains, however, were not stamped "Hamilton".

In 1938 the plaintiff began to put out assorted watch strap bracelets displayed on a panel at the top of which appeared the Hamilton crest with the words "Hamilton Watch" on the lower part of the crest. At the top of the panel appeared in large letters "Genuine Hamilton Watch Straps", the word "Hamilton" conspicuously standing out. The leather straps were stamped "Hamilton" and were mounted on individual cards upon which were stamped the Hamilton crest and also the words "Genuine Hamilton Strap". The several cards were mounted on a panel as shown in Ex. 31. The Hamilton Watch Company never manufactured watch attachments. Prior to 1938 the plaintiff did not particularly feature attachments apart from watches in their advertising.

Mr. Atkinson testified that since 1928 or 1929 the plaintiff has sold bracelets that were marked "Hamilton" but not all bracelets that the plaintiff sold were marked "Hamilton". He also testified that the plaintiff has not marketed very many models of men's watches with metal attachments because it had surveyed the trade on numerous occasions and had found that the consumer could probably be best served by having the retailer handle them as auxiliary attachments. He testified that the bracelet was not advertised by itself and that the watch was the essential feature as far as the Hamilton Watch Company is concerned.

The plaintiff used the slogan "The Watch of Railroad Accuracy" which it stressed in its national advertising, its decalcomania window signs (Ex. 115), and its authorized dealers plaques (Ex. 114).

There was testimony that the gross sales of the plaintiff's merchandise from 1892 to 1940 amounted to about $100,000,000 at factory prices and that the plaintiff had spent about $5,000,000 for advertising since 1908.

The evidence is clear and convincing that the plaintiff featured its watch in its advertisements. It was not until 1938 that it began the separate advertising of leather wrist watch straps. These straps could be attached to watches of any manufacturer.

The defendants contend that they began to use the name "Hamilton" for their jewelry in 1933 after Spear purchased a small quantity of chains in an unfinished state from the then liquidating firm of Hamilton & Hamilton, Jr., Inc. which had been manufacturing and selling chains and other jewelry since 1873 in Providence.

The plaintiff's statement in its application filed March 28, 1925, under the Act of February 20, 1905, sets forth in part:

"Hamilton Watch Company * * * has adopted and used the trade-mark shown in the accompanying drawing, for Watches, Watch Movements, and Parts Thereof, * * *

"The trade-mark has been continuously used and applied to said goods in applicant's business since 1892.

"The trade-mark is applied or fixed to the goods themselves by engraving or marking upon the movement plates and dials and by means of labels upon boxes or packages containing the same on which labels the trade-mark is printed, the word 'Hamilton' being used alone or with other words and in different styles of letters.

"The mark has been in actual use as a trade-mark by the applicant for ten years next preceding February 20, 1925, and such has been exclusive." (Italics ours.)

Mr. Atkinson's testimony concerning the eight dials (Ex. 79) amounts to little more than hearsay. He admitted that all the knowledge he had of these dials he learned from somebody else and that said dials were first handed to him in a hotel in Providence the day before the trial started by one of the plaintiff's attorneys. He testified "to the best of my recollection that the dials were produced about the 1905 period, or the 1895 period."

John C. Weise testified that he started to work for the plaintiff in 1893 as an engraver and was a foreman of the engraving department for about thirty-five or forty years, and that up to seven years ago he made all the dies for stamping the name on the movement. In his direct testimony he was asked: "Q. And they were stamping them 'Hamilton' from the time you came to work? A. Yes, they started from the very first day I got here." He produced a book (Ex. 7) containing many engravings that were "dial names of different jewelers through the country".

He also testified in direct examination: "Q. Mr. Weise, will you tell us whether or not many jewelers had their names put on the watches rather than the Hamilton name? That is, years ago? A. I can show you thousands of them, thousands."

88

In cross-examination he testified as follows:

"Q. Now, Mr. Weise, I want to ask you one more question; when you first began to make these dials for the Hamilton Watch Company, isn't it a fact that your first dials had the name 'Hamilton Watch Co.' on, instead of 'Hamilton'? A. Yes, indeed.

"Q. And those were made in script similar to the script in which the word 'Hamilton' appears on these dials on Exs. 4 and 5? A. Yes.

"Q. And at some time you adopted the practice of simply putting the 'Hamilton' on instead of 'Hamilton Watch Co.'? A. Yes, sir, 20 to 25 years, I would say, or up to 30 years ago; I won't just say as to the year, but it is between 20 and 30 years ago that we started the watches with 'Hamilton' on them."

In re-direct examination he testified:

"Q. When you commenced putting the word 'Hamilton' on instead of 'Hamilton Watch Co.', did you from that time on continue to put the word 'Hamilton', alone, on? A. Not exactly—I couldn't tell unless I would have my books that were destroyed when I moved over here from the factory, but I will guarantee that it is between 20 and 30 years that these dials is made with 'Hamilton' on. How long I engraved them before that—that might be some time too, you know.

"Q. Do I understand that the word 'Hamilton' alone appeared some 20—say 20 to 30 years ago; and that from 20 to 30 years ago, up to date, after you commenced to use the word 'Hamilton', you continued to use the word 'Hamilton', alone? A. We never used anything else but 'Hamilton' then, no, sir."

Harry A. Ruthhart, material sales manager for the plaintiff, testified:

"Q. You stated, Mr. Ruthhart, that you had been connected with the company for forty-two years. Do you recall how Hamilton watches were marked when you first came with the company? A. Yes, 'Hamilton Watch Company, Lancaster, Pa.' was usually stamped on the movement, and 'Hamilton Watch Company' was stamped on some dials—oh—way back, possibly 35 or 40 years; but for many years 'Hamilton' alone has been stamped on the dial. But there were some dials that were stamped 'Hamilton Watch Company'.

"Q. Were any of the dials, as far as you can recall, stamped only 'Hamilton' when you first came with the company? A. Were there any stamped just 'Hamilton', you say?

"Q. Yes? A. I wouldn't recall. I couldn't answer that.

"Q. How long can you recall that some dials have been stamped only 'Hamilton'? A. Oh, I would say thirty years.

"Q. More or less thirty years? A. More or less, yes. I can't be positive about it."

Ruthhart's deposition was taken by the plaintiff which did not offer it as part of its case. (Tr. p. 600.) The defendants offered Ruthhart's testimony as part of their case. (Tr. p. 767.)

"Hamilton" is a surname and is also a geographical name and its trade-mark registration was made under the so-called ten year proviso of the Federal Trade Mark Act of February 20, 1905.

Section 5 of the Trade Mark Act, 15 U.S.C.A. § 85, enumerates among other marks which ordinarily may not be registered, marks which consist "merely in the name of an individual" or "merely a geographical name or term." The plaintiff admits that this would apply to the name "Hamilton" except for the ten year proviso which reads: " * * * *And provided further,* That nothing herein shall prevent the registration of any mark used by the applicant or his predecessors, or by those from whom title to the mark is derived, in commerce with foreign nations or among the several States or with Indian tribes which was in actual and exclusive use as a trade-mark of the applicant, or his predecessors from whom he derived title, for ten years next preceding February 20, 1905: * * *."

It was under this clause that the registration certificate of trade-mark No. 203,-657 was issued. (Ex. 62)

The plaintiff contends that the date of February 20, *1925,* instead of the correct date of the act, February 20, 1905, in its certificate of registration No. 203,657 was an obvious error which escaped the notice of both the registrant and the Patent Office.

I recall no testimony offered by the plaintiff to the effect that the date was an error or that any attempt was made by the plaintiff to correct it.

The plaintiff's petition and statement and power of attorney filed in the Patent Office on March 28, 1925, stated that "the trade-mark had been continuously used and applied * * * for more than thirty years past * * *."

In a letter to the Commissioner of Patents under date of March 28, 1925, the plaintiff's attorney wrote as follows: "It is asked that the examination of the application filed herewith by Hamilton Watch Company of its trade-mark 'Hamilton' may be proceeded with expeditiously since registration is sought primarily to take advantage of Section 27 of the Trade Mark Act of 1905, in order to stop the threatened importation from Switzerland of watches with the trade-mark 'Hamilton' applied thereto in defiance of applicant's rights, applicant having been reliably informed that such importation is imminent." (Ex. S)

On April 16, 1925, the Patent Office replied, in part: "Registration under the Act of 1905 is refused on the ground that the mark consists in a surname not distinctively displayed, and is also geographical, * * *. Attention is directed to the 'ten year proviso', Sec. 5, Act of 1905. If the applicant's date of use carries the use back of February 20, 1895, advantage may be taken of such provision and the mark registered under the 1905 Act. * * *"

On May 9, 1925, the plaintiff wrote again to the Patent Office, in part:

"In the second paragraph substitute 'since the year' for 'for more than thirty years past'."

* * * * *

"In the statement before the power of attorney, insert:

" 'The mark has been in actual use as a trade-mark by the applicant for ten years next preceding February 20, 1925, and such use has been exclusive.' " (Italics ours.)

On May 12, 1925, the plaintiff wrote to the Commissioner of Patents:

"In the blank left for the year in the amendment to the statement insert the year '1892'.

"The new declaration is filed herewith."

Ex. 24, p. 3, discloses the following action taken at a stockholders' meeting held in Lancaster, Pa., November 11, 1892: "On motion the following was adopted: Whereas, the name 'Columbian Watch Co.' has been adopted by an association in the West, it is Resolved: That the name and title of this corporation be changed to Hamilton Watch Company."

On sheet 6 of Ex. 24 the following significant record appears in the directors' meeting of September 22, 1893: "The new watch was taken apart and inspected by the Directors present, who were very much pleased with its appearance."

The Hamilton Watch Company was incorporated in Pennsylvania, December 14, 1892. (Ex. 45)

These records do not convince me that "the trade-mark has been continuously used and applied to said goods in applicant's business since 1892" as the plaintiff alleged in its statement filed in the Patent Office on March 28, 1925.

In Grove Laboratories v. Brewer & Co., 1 Cir., 103 F.2d 175, 183, the court said: "Under the Act of 1905, as under the Act of 1881, it is presumed, from the issuance of registration, that all the requirements of the Act preliminary to registration had been complied with (see Sections 6, 7, 8 and 9 of Act 1905 [15 U.S.C.A. §§ 86, 87, 88 and 89]), and, in the absence of any evidence to the contrary, we find that they were in fact complied with."

In United States v. Chemical Foundation, 272 U.S. 1, 14, 47 S.Ct. 1, 6, 71 L.Ed. 131, the court said: " * * * The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. * * *"

A careful examination of the certified copy of the File Wrapper and Contents in Trade-Mark Registration No. 203,657, (Ex. S) ; the fact that the plaintiff did not make a complete watch until 1909; the script marking on the eight dials (Ex. 79), as distinguished from the block lettering on Registration No. 203,657; the testimony of Weise and Ruthhart; the conflicting statements of the plaintiff in its application for registration and the corporate records, lead me to the conclusion that the plaintiff has not shown that the trade-mark was in actual and exclusive use of the plaintiff during the ten year period (1895-1905), but that the actual and exclusive use commenced about the time that the plaintiff began the manufacture of the complete watch in 1909.

The defendants have shown by clear and convincing evidence of the plaintiff's own witnesses and by the exhibits referred to that all the requirements of the act prelim-

inary to registration had not been complied with by the plaintiff.

■ To decide whether the defendants are guilty of unfair competition, the court is confronted with this question: Are the goods of the respective parties so related, commercially or otherwise that, when marketed under the name "Hamilton", the purchasing public might reasonably conclude that they originated with the same concern?

The evidence and the exhibits compel me to answer the question in the affirmative.

The plaintiff, in its brief, p. 51, states: "In the case at bar a few incidents have been shown which indicate actual confusion."

The incidents were of little or no importance and it is unnecessary to enumerate them here.

There is no evidence that any trade has been diverted from the plaintiff to the defendants, nor is there any evidence of any loss of business by the plaintiff as a result of confusion.

The plaintiff markets its goods through some forty selected wholesalers with allocated territories, who employ in the neighborhood of two hundred fifty active salesmen on the road all over the United States who sell the retail jewelers for resale to the public.

The defendants sell their products to retail jewelers in various parts of the United States and the consuming public buys the products of both parties generally from retail jewelers. Clerks in many cases sell the goods of the respective parties.

There was testimony that the watch is the essential feature as far as the Hamilton Watch Company is concerned and that it is quite common in the industry for bracelet and chain manufacturers to be entirely independent and sell their products to watch manufacturers.

The evidence convinces me that the goods of the parties are considered by the purchasing public as jewelry and are of the "same descriptive properties".

The point has been expressly ruled between these parties in Hamilton Watch Co. v. Young's, Inc., Com'r of Patents, 40 U.S.P.Q. 568. That was a cancellation proceeding by the plaintiff against Young's Inc. to cancel registrations by Young's Inc. of the mark "Hamilton" for Waldemar chains, vest chains, Dickens chains, bracelet attachments, neck chains and neck ornaments. The Assistant Commissioner said,

in part: "I consider watches, watch cases, wrist watch straps and wrist watch bracelets to be goods of the same descriptive properties and also to be goods of the same descriptive properties as the goods named in registrant's registration involved herein."

The registrations of Young's Inc. were cancelled.

In the case of Elgin Nat. Watch Co. v. Loveland, C.C., 132 F. 41, 51, the court said: " * * * If a watch or watch movement, however, is not included in the general term 'jewelry', it is so closely associated therewith that the public in general regard the dealing therein as a part of the jewelry business, and they are generally handled by jewelers, and in fact are a branch of the jewelry trade. * * *"

The defendants strenuously urge that they are not in competition with the plaintiff; that they never represented their goods to any one as the goods of the plaintiff or induced others to make such representations in order to palm them off as the goods of the plaintiff.

The defendants maintain that they used the name "Hamilton" in good faith because there had been a firm of manufacturing jewelers in Providence, Rhode Island, from 1870 to 1933 by the name of Hamilton & Hamilton, Jr., Inc., which manufactured and sold gold filled chains known to the trade as "Hamilton Gold Filled Chains" and were so advertised. (Ex. P.) That concern also advertised a "Lady Hamilton" line of costume jewelry for women. (Ex. Q) The trade-mark of Hamilton & Hamilton, Jr., Inc. was a symbol of a star and "H. & H."

Mr. Spear who had been in the manufacturing jewelry business since 1915, testified that in 1933 he bought at the liquidation of Hamilton & Hamilton, Jr., Inc. a small lot of raw chains and other items of jewelry which he finished up into merchantable goods and sold them to the trade in the fall of 1933 as "Hamilton" chains and as merchandise purchased from Hamilton & Hamilton, Jr., Inc.

He further testified:

"Q. How did you come to use the name Hampden? A. Well, the name Hampden was known throughout the country in the jewelry trade for years with reference to watches and was an established named and when the Hampden Watch Company discontinued business, somewhere back in 1928

or 1929 they sold out their assets to the Russian Government and abandoned their plant and assets, we thought after looking over various names, as I have said before, which we had used from time to time that the name would be such as might appeal to the trade for jewelry and after trying it out for a while we have found that it is accepted and it continued."

"Q. Wasn't it precisely the same reason that led you to adopt the name 'Hamilton', because it was a well-known trade name in the jewelry trade on account of a watch of that name and you thought it would have an appeal to the trade, just as you said about the name 'Hampden'? A. No, that is not the reason."

The defendants have used many other names for their goods such as "Victoria", "Victor", "Hampden", "Commander", "Administrator", "Democrat", "Stetson", "Princess", "Cameo", "Premier", and "Esquire", and have also done business under such other names as "Consolidated", "Edison" and "Wedluck".

Ralph S. Hamilton, Jr., president and treasurer of Hamilton & Hamilton, Jr., Inc., testified that his concern went out of business in 1933; that he had no record of the job lot of chains purchased from Hamilton & Hamilton, Jr., Inc. by Spear because the purchase of a small lot was entered as a cash sale. He testified that their chains were known as Star H. & H. or Hamilton & Hamilton.

The testimony of many witnesses engaged in the retail, wholesale and manufacturing jewelry business convinces me that the name "Hamilton" in the jewelry business means the Hamilton Watch Company and its products.

In the case of Emerson Electric Mfg. Co. v. Emerson Radio & P. Corp., 2 Cir., 105 F.2d 908, 910, certiorari denied 308 U.S. 616, 60 S.Ct. 262, 84 L.Ed. 515, the court said: " * * * However, more recently it has become settled that * * * if one merchant has established a business under his name in wares of one sort, a second merchant may not use that name in selling other wares, if these are so like the first merchant's that the public will be apt to think that the first merchant is selling them. We have so held a number of times." (Cases cited.)

The particular products or class of products of the plaintiff to which the name "Hamilton" was applied prior to the defendants' adoption and use of that name for their jewelry consisted of pocket watches, wrist watches, and watch attachments, which have also been considered jewelry.

The plaintiff has advertised extensively all over the country and has spent large sums of money in making known its goods to the public. The good will and high reputation for its products are not denied.

The plaintiff's field from at least 1893 to 1909 was the manufacture of watch movements and from 1909 to 1914 complete pocket watches. In 1914 it began the manufacture and sale of wrist watches which were usually sold with attachments, such as metal link bracelets, leather strap bracelets with gold buckles, ribbon bracelets, metal chain bracelets, and khaki colored fabric bracelets with metal clasps. These attachments were also sold separately although they were not featured in plaintiff's advertising other than as part of a watch until 1938 when the plaintiff advertised the sale of leather strap bracelets to the public.

There was testimony that the plaintiff sold at least 200,000 separate watch attachments in the last ten years. In the same period the plaintiff distributed upward of two and one-half million bracelet watches.

In 1935 and 1936 the plaintiff heard of the increasing popularity in the sales of pocket watches and in 1937 began a sales research experiment in selling Waldemar chains which were stamped "Hamilton" on the swivel. There was testimony that the plaintiff sold "several gross" and that the experiment was not successful. Prior to 1937 the plaintiff marketed these chains occasionally for presentation purposes and although they did not bear the name "Hamilton", the containers were so marked.

The defendants contend that the mark "Hamilton" is restricted to watches.

In the case of Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 973, the court said:

" * * * The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises. Therefore it was at first a debatable point

whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trade-mark? The law often ignores the nicer sensibilities.

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. Aunt Jemima Mills Co. v. Rigney [& Co., 2 Cir.] 247 F. 407, L.R.A. 1918C, 1039; Akron-Overland [Tire Co.] v. Willys-Overland [Co., 3 Cir.] 273 F. 674; Vogue Co. v. Thompson-Hudson Co. [6 Cir.] 300 F. 509; Wall v. Rolls-Royce [3 Cir.] 4 F.2d 333. * * *"

In Collins Co. v. Oliver Ames & Sons Corporation, C.C., 18 F. 561, 571, the court said: "It is strongly urged, on the part of the defendant, that a mark or stamp, to be a trade-mark, must be the mark of an existing trade; that the mark 'Collins & Co.' on shovels, when adopted by Ames & Sons, became the mark of a trade in shovels carried on by Ames & Sons; that the plaintiff had no trade in shovels at the time; that the mark 'Collins & Co.' thus became the mark of Ames & Sons' trade in shovels, and the property of Ames & Sons in respect to shovels made by them, by prior right; that any use of that mark on shovels afterwards by the plaintiff became wrongful as against Ames & Sons or the defendant; and that the plaintiff has no right in the premises which it can enforce against the defendant. This view is specious but unsound. The plaintiff having from 1843 the right to make any article of iron, steel, or other metal, and having gone on from that time, both before and after 1856, extending its manufacture beyond edge-tools into digging tools, such as picks and hoes, and having always put the mark 'Collins & Co.' on its best quality of articles, the fact that it did not before 1856 make a digging tool such as the shovels on which, in 1856, Ames & Sons put the mark 'Collins & Co.,' does not warrant the conclusion that that mark was not in 1856 the mark of the plaintiff's trade in respect to such shovels."

In L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273, the court said: "It is now well settled in this country that a trade-mark protects the owner against not only its use upon the articles to which he has applied it, but upon such other goods as might naturally be supposed to come from him. [Cases cited.] There is indeed a limit; the goods on which the supposed infringer puts the mark may be too remote from any that the owner would be likely to make or sell. It would be hard, for example, for the seller of a steam shovel to find ground for complaint in the use of his trade-mark on a lipstick. But no such difficulty arises here; razor blades are sold very generally by others than razor blade makers, and might well be added to the repertory of a pen maker. * * *"

The complaint in this action was filed September 5, 1939, and the defendants filed their answer and counterclaim September 27, 1939. The plaintiff filed its reply to the counterclaim on December 11, 1939. The plaintiff filed its "Voluntary Bill of Particulars" on August 29, 1940. On September 5, 1940, the defendants filed their motion for an order dismissing the plaintiff's cause of action with respect to the trade-mark "Hampden" and for other relief. On October 9, 1940, the defendants renewed their motion to dismiss with prejudice and on the merits the plaintiff's cause of action and claim with respect to the trade-mark "Hampden" and decision was reserved on these motions.

Rule 41(a)(2) of the Rules of Civil Procedure for the District Courts of the United States, 28 U.S.C.A. following section 723c, provides: *"By Order of Court.* Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon him of the plaintiff's motion to dismiss, the action shall not be dismissed against the

Page 93

defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice."

In this case the counterclaim had been pleaded by the defendants prior to the service upon them of the plaintiff's "Voluntary Bill of Particulars" and the defendants had been put to great expense in the preparation of their defense in the taking of depositions in many places throughout the country.

The plaintiff's "Voluntary Bill of Particulars" reads as follows: "In order to simplify the issues and further define the relief which will be sought under the complaint, plaintiff hereby gives notice that it will not claim the relief prayed for with respect to the word 'Hampden'."

This proceeding is a violation of Rule 41.

The only case which the plaintiff cites in support of such action is Midwest Mfg. Co. v. Staynew Filter Corporation, D.C., 7 F.Supp. 360, in which the plaintiff moved for leave to file a voluntary bill of particulars under federal equity rule 20, 28 U.S C.A. section 723 Appendix. The case is not in point.

The following cases support the defendants' motions to dismiss with respect to the trade-mark "Hampden":

In McCann v. Bentley Stores Corporation, D.C., 34 F.Supp. 234, 235, the court said: "When the Supreme Court promulgated this rule and provided that the court might permit a dismissal without prejudice 'upon such terms and conditions as the court deems proper' what sort of 'terms and conditions' was contemplated? I have found nothing in the books upon which to base an answer, but no 'terms and conditions' are conceivable except such as are calculated to compensate the defendant for the expense to which he has been put. * * * "

In Cincinnati Traction Bldg. Co. v. Pullman-Standard Car Mfg. Co., D.C., 25 F. Supp. 322, the court said: "Plaintiff has chosen the forum and has required defendant to answer and prepare its defense at great expense. In such case defendant is entitled to have the controversy finally adjudicated so that it may definitely know its rights. Under the new Federal Rules of Civil Procedure the court is given the discretion to dismiss or not to dismiss the action. * * * "

See, also, Paul E. Hawkinson Co. v. Goodman, D.C., 32 F.Supp. 732; Delahanty v. Newark Morning Ledger Co., D. C., 26 F.Supp. 327.

The defendants' motions to dismiss with prejudice the plaintiff's cause of action and claim with respect to the trade-mark "Hampden" are granted.

I find that Registration No. 203,657 did not comply with the requirements of the Trade-Mark Act of February 20, 1905.

I find that the trade-mark "Hamilton" was not used by the plaintiff during the required ten year period.

I find that the trade-mark "Hamilton" was not used by the plaintiff on the articles specified in said registration during the required ten year period.

I find that the trade-mark "Hamilton" was not used by the plaintiff in the form applied for, during the required ten year period.

I find that Registration No. 203,657 was procured by a false declaration.

I find that the trade-mark "Hamilton" has been applied to watches, watch movements and parts thereof in the plaintiff's business since 1909 and is not restricted to watches.

I find that the defendants have not established rights to the use of the name "Hamilton".

I find that the firm of Hamilton & Hamilton, Jr., Inc., was not known by the name "Hamilton" and defendants' use of the name "Hamilton" was not derived from the firm of Hamilton & Hamilton, Jr., Inc.

I find that the trade name "Hamilton" applied to chains does not identify the defendants.

I find that the plaintiff has not shown convincing evidence of confusion.

I find that the defendants' use of the name "Hamilton" was for the purpose of palming off their goods as the goods of the plaintiff.

Conclusions.

Trade-Mark Registration No. 203,657 is invalid.

The use of the name "Hamilton" by the defendants constitutes unfair competition.

The plaintiff is entitled to an injunction.

I will hear the parties January 26, 1942, at 10 A. M. on the form of decree to be entered and the matter of costs.